## GOMPERS v. BUCKS STOVE & RANGE COMPANY.

### CERTIORARI TO THE COURT OF APPEALS OF THE DISTRICT OF COLUMBIA.

No. 372.　Argued January 27, 30, 1911—Decided May 15, 1911.

An order of a court of equity, restraining defendants from boycotting complainant by publishing statements that complainant was guilty of unfair trade, does not amount to an unconstitutional abridgment of free speech; the question of the validity of the order involves only the power of the court to enjoin the boycott.

Quære as to what constitutes a boycott that may be enjoined by a court of equity; but, in order that it may be enjoined, it must appear that there is a conspiracy causing irreparable damage to complainant's business or property.

Where conditions exist that justify the enjoining of a boycott, the publication and use of letters, circulars and printed matter, may constitute the means of unlawfully continuing the boycott and amount to a violation of the order of injunction.

The Anti-trust Act of 1890 applies to any unlawful combination resulting in restraint of interstate commerce including boycotts and blacklisting whether made effective by acts, words or printed matter. *Loewe* v. *Lawlor*, 208 U. S. 274.

The court's protective powers extend to every device whereby property is irreparably damaged or interstate commerce restrained; otherwise the Anti-Trust Act would be rendered impotent.

Society itself is an organization and does not object to organizations for social, religious, business, and all other legal, purposes.

On appeal against unlawfully exercising power of organizations it is the duty of government to protect the one against the many as well as the many against the one.

An agreement to act in concert on publication of a signal makes the words used as the signal amount to verbal acts, and, when the facts justify it, the court having jurisdiction can enjoin the use of the words in such connection; and so *held* as to words "unfair" and "we don't patronize" as used in this case for the purpose of continuing a boycott.

Civil and criminal contempts are essentially different and are governed by different rules of procedure.

A proceeding, instituted by an aggrieved party to punish the other

party for contempt for affirmatively violating an injunction in the same action in which the injunction order was issued, and praying for damages and costs, is a civil proceeding in contempt, and is part of the main action, and the court cannot punish the contempt by imprisonment for a definite term; the only punishment is by fine measured by the pecuniary injury sustained.

In criminal proceedings for contempt the party against whom the proceedings are instituted is entitled to the protection of the constitutional provisions against self-incrimination.

There is a substantial variance between the procedure adopted and punishment imposed, when a punitive sentence appropriate only to a proceeding for criminal contempt is imposed in a proceeding in an equity action for the remedial relief of an injured party.

Where the main suit in which an injunction order has been granted is settled and discontinued, every proceeding which is a part thereof, or dependent thereon, is also necessarily settled as between the parties; and so held as to a proceeding instituted by the party aggrieved against the other party for violation of an injunction.

The fact that the party aggrieved by the violation of an injunction deprives himself, by settling the main case, of the right to pursue the violator for contempt does not prevent the court, whose order was violated, from instituting proceedings to vindicate its authority; and in this case the dismissal of the civil contempt proceeding is without prejudice to the power and right of the court whose injunction was violated to punish for contempt by proper proceedings.

33 App. D. C. 516, reversed.

THIS is a proceeding to reverse a judgment, finding that Samuel Gompers, John Mitchell and Frank Morrison were guilty of contempt in violating the terms of an injunction restraining them from continuing a boycott, or from publishing any statement that there was or had been a boycott against the Bucks Stove & Range Company. The contempt case grew out of litigation reported in 33 App. D. C. 83, 516. It will only be necessary to briefly refer to the facts set out in that record.

The American Federation of Labor is composed of voluntary associations of labor unions with a large membership. It publishes the American Federationist, which has a wide circulation among the public and the Federa-

tion. Samuel Gompers is president. and editor of the paper. John Mitchell is vice president of the Federation and President of the United Mine Workers, one of the affiliated unions. Frank Morrison has charge of the circulation of the paper. The Federation had a difference as to the hours of labor with the Bucks Stove & Range Company, of which J. W. Van Cleave was president, who was also president of the American Manufacturers' Association. This controversy over the hours of work resulted in a boycott being declared against the Bucks Stove & Range Company, and it was thereupon declared "Unfair" and was published in the American Federationist on the "Unfair" and "We don't patronize" lists. The company filed in the Supreme Court of the District of Columbia its bill against the Federation, the defendants above named and other officers, alleging that the defendants had entered into a conspiracy to restrain the company's state and interstate business, in pursuance of which they had boycotted it, published it on the unfair lists, and had by threats also coerced merchants and others to refrain from buying Bucks' products for fear that they themselves would be boycotted if they continued to deal with that company. The result of the boycott had been to prevent persons from dealing with it and had greatly lessened its business and caused irreparable damage.

After a lengthy hearing, the court on December 18, 1907, signed a temporary injunction, which became effective when the bond required was given on December the 23d. The order is published in the margin.[1]

[1] Ordered that the American Federation of Labor, Samuel Gompers, Frank Morrison, . .. . John Mitchell, . . . their and each of their agents, servants, attorneys; confederates, and any and all persons acting in aid of or in conjunction with them or any of them be, and they hereby are, restrained and enjoined until the final decree in said cause from conspiring, agreeing or combining in any manner to restrain, obstruct or destroy the business of the complainant, or to

Thereafter testimony was regularly taken, and on March 23, 1908, the injunction was made permanent, with provisions almost identical with the temporary order of December 17, 1907.

From this final decree the defendants appealed, but be-

prevent the complainant from carrying on the same without interference from them or any of them, and from interfering in any manner with the sale of the product of the complainant's factory or business by defendants, or by any other person, firm or corporation, and from declaring or threatening any boycott against the complainant, or its business, or the product of its factory, or against any person, firm or corporation engaged in handling or selling the said product, and from abetting, aiding or assisting in any such boycott, and from printing, issuing, publishing, or distributing through the mails, or in any other manner, any copies or copy of the American Federationist, or any other printed or written newspaper, magazine, circular, letter or other document or instrument whatsoever, which shall contain or in any manner refer to the name of the complainant, its business or its product in the "We don't patronize," or the "Unfair" list of the defendants, or any of them, their agents, servants, attorneys, confederates, or other person or persons acting in aid of or in conjunction with them or which contains any reference to the complainant, its business or product in connection with the term "Unfair" or with the "We don't patronize" list or with any other phrase, word or words of similar import, and from publishing or otherwise circulating, whether in writing or orally, any statement or notice of any kind or character whatsoever, calling attention to the complainant's customers, or of dealers or tradesmen, or the public, to any boycott against the complainant, its business or its product, or that the same are, or were, or have been declared to be "unfair," or that it should not be purchased or dealt in or handled by any dealer, tradesman, or other person whomsoever, or by the public, or any representation or statement of like effect and import, for the purpose of, or tending to, any injury to or interference with the complainant's business, or with the free and unrestricted sale of its product, or of coercing or inducing any dealer, person, firm or corporation, or the public, not to purchase, use, buy, trade in, deal in, or have in possession stoves, ranges, heating apparatus, or other product of the complainant, and from threatening or intimidating any person or persons whomsoever from buying, selling, or otherwise dealing in the complainant's product, either directly or through orders, directions or suggestions to committees, associations, officers, agents or others, for the

fore a decision was had, the Bucks Stove & Range Company began contempt proceedings, by filing in the Supreme Court of the District a petition entitled "Bucks Stove & Range Company, plaintiff, vs. The American Federation of Labor *et al.*, defendants, No. 27,305, Equity," alleging that petitioner had "filed in this cause its original bill of complaint, naming as defendants, among others, Samuel Gompers, Frank Morrison and John Mitchell." All of the record and testimony in the original cause was made a part of the petition as follows:

"Reference is hereby made to the original bill and exhibits filed in support of the same, the answer and amended answer of the defendants, the testimony taken on both sides, the original order restraining and enjoining the dedefendants *pendente lite*, and the final decree in the cause, and each and every other paper and proceeding in this cause from the institution of the suit to the filing of this

---

performance of any such acts or threats as herein above specified, and from in any manner whatsoever impeding, obstructing, interfering with or restraining the complainant's business, trade or commerce, whether in the State of Missouri or in other States and Territories of the United States, or elsewhere wheresoever, and from soliciting, directing, aiding, assisting or abetting any person or persons, company or corporation to do or cause to be done any of the acts or things aforesaid.

And t is further ordered by the court that this order shall be in full force, obligatory and binding upon the said defendants and each of them and their said officers, members, agents, servants, attorneys, con- federates, and all persons acting in aid of or in conjunction with them, upon the service of a copy thereof upon them or their solicitors or solicitor of record in this cause: *Provided*, The complainant shall first execute and file in this cause, with a surety or sureties to be approved by the court, or one of the justices thereof, an undertaking to make good to the defendants all damage by them suffered or sustained by reason of wrongfully and inequitably suing out this injunction, and stipulating that the damages may be ascertained in such manner as the justice of this court shall direct, and that, on dissolving the injunction, he may give judgment thereon against the principal and sureties for said damages in the decree itself dissolving the injunction.

petition, and it is prayed that the same may be taken and read as a part hereof at any and all hearings upon this petition, whether in this court or on appeal from its decision herein rendered."

Some of the publications were charged to be in violation of the terms of the temporary injunction, dated December 23, 1907, and others were alleged to be in violation of the final decree dated March 23, 1908.

The petition set out in nine distinct paragraphs, the speeches, editorials and publications made at different times by the several defendants, charging that in each instance they continued and were intended to continue the boycott, and to republish the fact that the complainant was or had been on the "unfair list." It concluded by alleging that by the devices, means, speeches and publications set forth, and in contempt of court the defendants had disobeyed its orders and violated the injunction. The prayer was (1) that the defendants be required to show cause why they should not be attached for contempt, and adjudged by the court to be in contempt of its order and its decree in this cause and be punished for the same. (2) And that petitioner may have such other and further relief as the nature of its case may require. (Signed: Bucks Stove & Range Company, by J. W. Van Cleave, President.) It was also sworn to by the President of the company and signed by its solicitors.

A rule to show cause issued, requiring each of the defendants to show cause why they should not be adjudged to be in contempt and be punished for the same. Each of the defendants answered under oath, and, as treating the contempt proceeding as a part of the original cause, admitted the allegations as to the history of the litigation in paragraphs 2, 3, 4 and 5 of the petition, but "for greater accuracy refer to the record in this cause." Publications were admitted but explained. Each of the defendants denied under oath that he had been in disregard or

contempt of the court's order and denied that any of the
acts and charges complained of constituted a violation of
the order.    There were several issues of fact on which
much evidence was taken.    This related to the question
of intent, and whether there had been a purpose and plan
to evade any injunction which might be granted.    There
was also an issue as to whether John Mitchell had put a
resolution to the convention of the United Mine Workers;
whether Samuel Gompers and Frank Morrison had
rushed the mailing of the January issue of the American
Federationist, on December 22, so as to avoid the in-
junction dated December 17, which became operative on
giving bond by complainant on December 23; and also
whether they had thereafter sold and circulated copies of
this issue containing the Bucks Stove Company on the
"Unfair" and "We don't patronize" list.    Evidence was
taken partly by deposition, partly before an Examiner in
Chancery.

Each of the defendants was called as a witness by the
complainant, and each testified as to facts on which the
allegation of intent or evasion was based, and as to the
publications, speeches and resolutions which he was ac-
cused of having made, and which the petition alleged con-
stituted an act of disobedience and contempt of court.

The court made a special finding as to two of the nine
charges, and then found that all three of the defendants
were guilty of the several acts charged in paragraphs 17
and 26; that respondents Gompers and Morrison were
guilty of the several acts charged in the sixteenth and
twentieth paragraphs; that respondent Morrison was
guilty of the acts charged in the twenty-fifth paragraph,
and that respondent Gompers was guilty of the several
acts charged in the paragraphs 19, 21, 22 and 23.    The
finding concluded: "The court being fully advised in the
premises, it is by it, this twenty-third day of December,
A. D. 1908, considered that the said respondents, Samuel

Gompers, Frank Morrison and John Mitchell, are guilty of contempt in their said disobedience of the plain mandates of the said injunctions; and it is, therefore ordered and adjudged that the said respondent, Frank Morrison, be confined and imprisoned in the United States jail in the District of Columbia for and during a period of six months; that the said respondent, John Mitchell, be confined and imprisoned in the said jail for and during a period of nine months, and that the respondent, Samuel Gompers, be confined and imprisoned in the said jail for and during a period of twelve months, said imprisonment as to each of said respondents to take effect from and including the date of the arrival of said respective respondents at said jail."

On the same day the defendants entered an appeal, which was allowed, and bail fixed. After notice to the defendants the complainant moved "the court to amend or supplement its decree by awarding to it its costs against the defendants under the proceedings in contempt against them." This motion was granted in an order which recited that "upon consideration of the motion of complainant, filed in the above cause for award of its costs in the contempt proceedings in said cause against the defendants Samuel Gompers, John Mitchell and Frank Morrison, and after argument by the solicitors of the respective parties, the motion is granted, and it is ordered that the complainant the Bucks Stove & Range Company do recover against the defendants named, its costs in the said contempt proceeding, to be taxed by the clerk, and that it have execution therefor as at law."

The parties also entered into a stipulation, the material portions of which are as follows:

"For the purpose of avoiding unnecessary cost in the matter of the appeal by the defendants Samuel Gompers, John Mitchell and Frank Morrison from the judgment against them under the contempt proceedings in the above entitled cause, it is stipulated that, . . . with

the approval of the Court of Appeals, the record in the
above cause [*Bucks Stove & Range Co.* v. *American Federa-
tion of Labor et al.*]   .   .   .   may be read from by either
party to the appeal in said contempt proceedings, in so far
as the same may be relevant and material, with like ef-
fect as if the said record of the original cause were em-
braced in the transcript, in the appeal from the said con-
tempt proceedings."

This stipulation was signed by counsel for the defend-
ants and for the Bucks Stove & Range Co.

The petition in the contempt proceeding, the answer,
orders, final decree, amended decree and stipulation were
all entitled in the original cause, "Buck's Stove & Range
Company *v.* The American Federation of Labor, Samuel
Gompers, John Mitchell, Frank Morrison, *et al.*" The
appeal papers in the Court of Appeals of the District
were, and those here on certiorari are entitled "Samuel
Gompers, John Mitchell and Frank Morrison, appellants,
*v.* The Buck's Stove & Range Company."

On December 23, 1908, the defendants were found
guilty of contempt, and on the same day they appealed.
On March 26, 1909, the Court of Appeals rendered its de-
cision in favor of the Bucks Stove Company on the ap-
peal from the decree of March 23, 1908, and found that
the decree was, in some respect, erroneous, and modified
it accordingly. From that decision both parties appealed
to this court—the Bucks Stove Company contending that
it was error to modify in any respect; the American Fed-
eration of Labor *et al.*, contending that the Court of Ap-
peals erred in not reversing and setting aside as a whole
the decree granting the injunction.

There subsequently came on to be heard in the Court
of Appeals of the District of Columbia the appeal from
the decree in the contempt proceeding. On that hearing
the Bucks Stove & Range Company moved to dismiss the
appeal, because the evidence had not been incorporated

in a bill of exceptions, claiming that it was a criminal proceeding and was governed by the practice applicable to law cases. This motion was resisted by the defendants, who contended that the contempt proceedings were a part of the equity cause and that the case was to be governed by equity practice, in which the whole record could be examined on appeal.

The Court of Appeals held that the proceeding was for criminal contempt and that for want of a bill of exceptions it could not examine the testimony but must treat the findings of fact by the judge as conclusive and limit its consideration to the question whether as a matter of law the petition charged and the finding found acts which amounted to a violation of the injunction. It held that some of the facts alleged did constitute a good charge of contempt, and as each of the defendants were found to be guilty of at least one of such acts of disobedience constituting a violation of the injunction and a contempt of court, it held that the conviction must be sustained. This ruling was put on the ground that on a general verdict of guilty, the conviction and sentence on an indictment containing several counts, some of which were bad must stand, if those which were good would sustain the sentence. It therefore not only refused to examine the evidence, to determine whether the proof was sufficient to sustain the conviction, but it also declined to consider the sufficiency of the other charges in the petition, of which the defendants were also found guilty. It affirmed the judgment of the Supreme Court of the District. The defendants thereupon applied for and obtained a writ of certiorari.

The appeal and cross appeal in the original cause of the *Bucks Stove and Range Company* v. *The American Federation of Labor et al.* were heard here together. During the argument it appeared that the parties had settled their differences and, on the ground that the questions were moot,

this court dismissed both appeals.  219 U. S. 581.  Following this disposition of those appeals, and on the same day, the contempt case was called, and was argued by counsel for the Bucks Stove and Range Company and counsel for Samuel Gompers, Frank Morrison and John Mitchell.

*Mr. Alton B. Parker* and *Mr. Jackson H. Ralston*, for petitioner, with whom *Mr. F. L. Siddons, Mr. W. E. Richardson* and *Mr. John T. Walker* were on the brief, for plaintiff in error:

Proceedings for contempt are of two classes,—those prosecuted to preserve the power and vindicate the dignity of the courts and to punish for disobedience of their orders, and those instituted to preserve and enforce the rights of private parties to suits and to compel obedience to orders and decrees made to enforce the rights and administer the remedies to which the court has found them to be entitled.  The former are criminal and punitive in their nature and the Government, the court and the people are interested in their prosecution.  The latter are civil, remedial and coercive in their nature and the parties generally interested in their conduct and prosecution are the individuals whose private rights and remedies they were instituted to protect or enforce.  *In re Nevitt*, 117 Fed. Rep. 448, 460, and cases cited.

This classification of, or distinction between, civil and criminal contempts was quoted with approval by this court in *Bessette* v. *W. B. Conkey Co.*, 194 U. S. 328.  The court adds that it may not be always easy to classify a particular act as belonging to either one of these two classes.  It may partake of the characteristics of both.  A significant and generally determinative feature is that the act is by one party to a suit in disobedience of a special order made in behalf of the other, quoting approvingly from *In re Debs*, 158 U. S. 564.

The case at bar is clearly within the definitions of a

civil contempt as set forth in these controlling authorities. It was instituted by a petition made by the Bucks Stove & Range Company; was entitled in the action which had resulted in the order and decree which the petitioner claimed the defendants Gompers, Mitchell and Morrison had disobeyed; asked that all the pleadings, testimony and proceedings in the action be deemed incorporated in the petition and taken and read as a part thereof; prayed that the defendants be punished for a violation of the order and decree and that petitioner should have such other and further relief as the nature of its case may require. The petition was presented to the Supreme Court, sitting as a court of equity, before one of the justices thereof, acting as a chancellor; it was entitled in the equity cause and marked "In Equity"; it was conducted from its beginning to its conclusion according to equity rules; all the testimony was taken before examiners as in chancery practice; it was all taken down in writing and reported to the court; there was never an opportunity or occasion to except to any ruling of the court in the rejection or the admission of testimony; the hearing was had upon the testimony thus reported and it was upon that testimony that the decree or judgment or sentence was based.

The courts below erred, therefore, in holding the proceeding to be one for the presentation of a criminal contempt, and hence a reversal should follow.

The Court of Appeals also fell into error in refusing to consider the evidence which the defendants contend shows that there was no violation of either the order or decree. The reason assigned by it for its action was that exceptions were necessary to bring up the record. But exceptions are neither necessary nor permissible according to the course and practice in equity, and, as we have seen, this was a proceeding in equity and conducted according to its rules from beginning to end by both court and counsel. Hence a reversal is required.

If the court should conclude that it is nevertheless its duty to examine into the merits to see whether a different result would have been required, and examination be made by the Court of Appeals, we urge that the record does not disclose a violation of either the order or decree by these defendants. On the appeal from the final decree in the action the Court of Appeals held that certain provisions of the decree were in excess of the power of the court because it deprived the defendants of the constitutional guarantees of freedom of the press and of speech, and modified it accordingly. It is settled in this court that in a case or proceeding within its jurisdiction as to parties and subject-matter, if the court makes an order in excess of its power it is void. *Ex parte Rowland,* 104 U. S. 604; *Ex parte Harding,* 120 U. S. 782; *In re Ayres,* 123 U. S. 243; *Ex parte Terry,* 128 U. S. 289.

We urge that the provisions the court held to be void were so interwoven with the valid provisions that they cannot be separated without destroying the general scheme and purpose of the decree, and hence that the entire decree should be held to be void.

If, however, this position should not meet with the approval of the court, we claim that the conduct of the defendants must be tested by the decree as modified by the Court of Appeals and not as made by the trial court. Thus tested it will appear that these defendants did not offend against either the letter or spirit of the decree. It is true that the name of the Bucks Stove & Range Company did appear in the "We don't patronize" list of the American Federationist after the order was made forbidding it. But it also appears that this was before the date when the order became effective by its very terms. Certainly the defendants cannot be held to have violated the order before it became operative. Moreover, it should be noted that never after the order went into effect was such a publication made. None of the other publica-

tions and speeches complained of offend against the decree as modified by the Court of Appeals.

If this court finds otherwise, the decrees of contempt should nevertheless be vacated because they embrace findings of which contempt was, but cannot lawfully be predicated. It cannot be said that the learned justice did not base this unusual and excessive punishment in part upon these findings, for he says necessarily, that he did when he presents them as a portion of the foundation of his sentence.

*Mr. Daniel Davenport* and *Mr. J. J. Darlington* for respondent:

The willful violation of an injunction by a party to a cause is a contempt of court constituting a specific criminal offense. *Bullock* v. *Westinghouse Co.*, 129 Fed. Rep. 107; *Ex parte Kearney*, 7 Wheat. 38, 42; *New Orleans* v. *Steamship Co.*, 20 Wall. 387, 392; *Hayes* v. *Fischer*, 102 U. S. 121.

The proceeding to punish for a contempt is in its nature a criminal proceeding, whether the result be only punishment of the party for the insult to the court, or whether a part of the punishment is by way of a fine payable to the party injured as compensation for the damages inflicted upon him by the contemptuous act. The fact that the punishment operates remedially does not alter the nature of the proceeding. Punishment for doing an act forbidden by the injunction is entirely different from punishment as a means of coercion to compel the doing of something commanded. The latter proceeding is properly speaking one for a civil contempt, the former one for a criminal contempt. The nature of the proceeding can readily be determined by an examination of the charge made. If it is for the doing of an act forbidden it is clearly a criminal proceeding, and not one for a civil contempt. It is perfectly apparent from the allegations of

the complaint, the answers of the defendants and the punishment the court inflicted, that the parties concerned all regarded the proceeding as one for the punishment of the accused for doing what they were commanded not to do. The prayer annexed to the complaint was that they be punished for their contempt. It is true that the complainant asked for such further relief as the court might allow as the nature of its case may require. Inasmuch as the thing complained of was an act forbidden to be done, the only relief possible was a fine payable to it as a part of the punishment for the contempt. Many cases sanctioned by this court approve of such joint punishment. *In re Christensen Engineering Co.,* 194 U. S. 458, and cases cited.

In a criminal proceeding to punish for a contempt for the violation of an injunction, no particular method is necessary to be pursued in bringing the matter to the attention of the court. Any sworn statement setting forth the facts is sufficient to authorize the court to proceed to investigate the charge. A rule to show cause why he should not be punished for his contempt is sufficient to bring him before the court, although an attachment may be granted in the first instance, where the case is urgent and the contempt flagrant. The trial may be had on answers, counter-affidavits or some other form of pleading presented as a defense. The defendant must be given opportunity to make explanation or defense. The court may adopt such mode of trial as, in its discretion it sees fit, in order to determine the fact of the contempt, provided due regard is had to the essential rules that obtain in the matter of contempts. Particular questions or issues, upon which to take testimony, may be referred to a referee, master or other designated person. The accusations must be supported by evidence sufficient to convince the mind of the trier beyond a reasonable doubt of the actual guilt of the accused. If satisfied of the guilt of the

accused the court can find him guilty and inflict the punishment either wholly by way of fine or imprisonment for the public offense, or partially for the benefit of the complainant. And in such proceeding it is perfectly proper and not unusual as a part of the punishment to award his costs to the complainant.

The record in this case shows that all these require- ments of the law were duly observed and the rights of the accused properly safeguarded. The court properly found the accused guilty of contempt of its authority and sentenced them to jail. Although it might have done so in this proceeding it did not, however, fine the defendants as a part of the punishment a sum payable to the complainant, except by way of costs.

Although the contempt consists in a violation of an injunction granted by a court of equity, since the proceeding for its punishment is one of law, review can be had only by writ of error, and not by appeal, and as in other law cases, a bill of exceptions is necessary to review any claimed error not otherwise apparent on the face of the record. *Continental Gin Co.* v. *Murray*, 162 Fed. Rep. 873.

Since there is no bill of exceptions here this court is confined therefore to a review of the sufficiency of the averments of the complaint, the answers, and the judgment of the court thereon. It cannot undertake to determine the fact of guilt or innocence, nor undertake to review rulings on questions of evidence. But it can properly review the two questions about which there is serious controversy here: Was the original order of the injunction void, for want of authority in the court to grant the injunction which was violated, and did the court exceed its authority in punishing them for its violation?

The injunction which the defendants violated was valid. It forbade the defendants to carry on a boycott against the complainant by any means whatever, and particularly,

by putting its name on an unfair list, publishing it as un-
fair, sending out boycott circulars, or by any act what-
ever, verbal or otherwise, inciting others to engage in or
carry it on.   This was a perfectly legitimate exercise of
power by the court, frequently exercised by it, sanctioned
by numerous precedents and not interfering in the least
with any legitimate use of speech or of the press.

That the boycott was illegal; that a person threatened
with irreparable injury to his business or property by a
boycott has the right to go into a court of equity for
protection from it; that the court has the right and power
to enjoin the prosecution of the boycott; that the court,
in thus enjoining the boycott can enjoin every act that
may be resorted to in carrying it out, including all verbal
and written acts, and particularly putting the victim on
an unfair list, sending out boycott notices and circulars,
making speeches for the purpose of prosecuting the boy-
cott, etc., for without this power to prevent such publica-
tions it could not stop the boycott; and that the constitu-
tional right of free speech and free press does not extend
to secure immunity to the boycotter in such cases, is so
well settled and declared by the courts as to render cita-
tions unnecessary.

If the injunction in this case had been erroneous, it
would have been the duty of the accused to obey it and
for the disobedience they would have been properly pun-
ished.   It is only void injunctions which parties are at
liberty to disobey.   An injunction erroneous but not void
must be as scrupulously obeyed as one entirely valid.
There is not the slightest ground for contention here that
this injunction was void.   The court confessedly had
jurisdiction of the parties and of the subject-matter of the
cause, and in granting the injunction it exercised its power
in conformity with the well settled practice of equity
courts.

The court did not exceed its authority in the punish-

ment it inflicted.  It was not excessive.  *Savin, Petitioner,*
131 U. S. 270; *United States* v. *Sweeny,* 95 Fed. Rep. 452,
457.

And though the proceeding was begun at the instance
of the Bucks Company, and the procedure thereafter was
such as the record shows it to have been, the precedents
clearly show that the court was well within its authority
in proceeding to inflict the punishment it did in vindicat-
ing its dignity.  It was a proceeding on its face looking
towards punishment, only punishment.  There was abso-
lutely nothing in the case which could suggest to the court
or the accused that the party was seeking coercion of the
accused into doing something which they had been com-
manded to do.  It can only be by a forced construction,
violating the plain provisions of the whole record, that
even a plausible contention can be made that this was a
proceeding for a civil contempt.  To reach such a con-
clusion it would be necessary to ignore the manifest dif-
ference between punishing the accused by a fine payable
to the complainant by way of reparation for the viola-
tion of the injunction, and fining or imprisoning him to
compel the performance of an act he had been ordered
to do.

MR. JUSTICE LAMAR, after making the foregoing state-
ment, delivered the opinion of the court.

The defendants, Samuel Gompers, John Mitchell and
Frank Morrison, were found guilty of contempt of court
in making certain publications prohibited by an injunc-
tion from the Supreme Court of the District of Columbia.
They were sentenced to imprisonment for twelve, nine
and six months respectively, and this proceeding is prose-
cuted to reverse that judgment.

The order alleged to have been violated was granted in
the equity suit of the *"Bucks Stove & Range Company* v.

*The American Federation of Labor and others,"* in which the court issued an injunction restraining all the defendants from boycotting the complainant, or from publishing or otherwise making any statement that the Bucks Stove & Range Company was, or had been, on the "Unfair" or "We don't patronize" lists. Some months later the complainant filed a petition in the cause, alleging that the three defendants above-named, parties to the original cause, in contempt of court and in violation of its order, had disobeyed the injunction by publishing statements which either directly or indirectly called attention to the fact that the Bucks Stove & Range Company was on the "Unfair" list, and that they had thereby continued the boycott which had been enjoined.

The defendants filed separate answers under oath, and, each denied: (1) That they had been in contempt or disregard of the court's orders: (2) That the statements complained of constituted any violation of the order; and, on the argument, (3) contended that if the publication should be construed to amount to a violation of the injunction they could not be punished therefor, because the court must not only possess jurisdiction of the parties and the subject-matter, but must have authority to render the particular judgment. Insisting, therefore, that the court could not abridge the liberty of speech or freedom of the press, the defendants claim that the injunction as a whole was a nullity, and that no contempt proceeding could be maintained for any disobedience of any of its provisions, general or special.

If this last proposition were sound it would be unnecessary to go further into an examination of the case or to determine whether the defendants had in fact disobeyed the prohibitions contained in the injunction. *Ex parte Rowland,* 104 U. S. 612. But we will not enter upon a discussion of the constitutional question raised, for the general provisions of the injunction did not, in terms,

restrain any form of publication. The defendants' attack on this part of the injunction raises no question as to an abridgment of free speech, but involves the power of a court of equity to enjoin the defendants from continuing a boycott which, by words and signals, printed or spoken, caused or threatened irreparable damage.

Courts differ as to what constitutes a boycott that may be enjoined. All hold that there must be a conspiracy causing irreparable damage to the business or property of the complainant. Some hold that a boycott against the complainant, by a combination of persons not immediately connected with him in business, can be restrained. Others hold that the secondary boycott can be enjoined, where the conspiracy extends not only to injuring the complainant, but secondarily coerces or attempts to coerce his customers to refrain from dealing with him by threats that unless they do they themselves will be boycotted. Others hold that no boycott can be enjoined unless there are acts of physical violence, or intimidation caused by threats of physical violence.

But whatever the requirement of the particular jurisdiction, as to the conditions on which the injunction against a boycott may issue; when these facts exist, the strong current of authority is that the publication and use of letters, circulars and printed matter may constitute a means whereby a boycott is unlawfully continued, and their use for such purpose may amount to a violation of the order of injunction. *Reynolds* v. *Davis*, 198 Massachusetts, 300; *Sherry* v. *Perkins*, 147 Massachusetts, 212; *Codman* v. *Crocker*, 203 Massachusetts, 150; *Brown* v. *Jacobs*, 115 Georgia, 452, 431; *Gray* v. *Council*, 91 Minnesota, 171; *Lohse Co.* v. *Fuelle*, 215 Missouri, 421, 472; *Thomas* v. *Railroad Co.*, 62 Fed. Rep. 803, 821; *Continental Co.* v. *Board of Underwriters*, 67 Fed. Rep. 310; *Beck* v. *Teamsters' Union*, 118 Michigan, 527; *Pratt Food Co.* v. *Bird*, 148 Michigan, 632; *Barr* v. *Essex*, 53 N. J.

Eq. 102. See also *Ludwig* v. *Western Union Telegraph Co.*, 216 U. S. 156; *Bitterman* v. *L. & N. R. R.*, 207 U. S. 206; *Board of Trade* v. *Christie*, 198 U. S. 236; *Scully* v. *Bird*, 209 U. S. 489.

While the bill in this case alleged that complainant's interstate business was restrained, no relief was asked under the provisions of the Sherman anti-trust act. But if the contention be sound that no court under any circumstances can enjoin a boycott if spoken words or printed matter were used as one of the instrumentalities by which it was made effective, then it could not do so, even if interstate commerce was restrained by means of a blacklist, boycott or printed device to accomplish its purpose. And this, too, notwithstanding § 4 (act of July 2, 1890, c. 647, 26 Stat. 209) of that act provides, that where such commerce is unlawfully restrained it shall be the duty of the Attorney General to institute proceedings in equity to prevent and enjoin violations of the statute.

In *Loewe* v. *Lawlor*, 208 U. S. 274, the statute was held to apply to any unlawful combination resulting in restraint of interstate commerce. In that case the damages sued for were occasioned by acts which, among other things, did include the circulation of advertisements. But the principle announced by the court was general. It covered any illegal means by which interstate commerce is restrained, whether by unlawful combinations of capital, or unlawful combinations of labor; and we think also whether the restraint be occasioned by unlawful contracts, trusts, pooling arrangements, blacklists, boycotts, coercion, threats, intimidation, and whether these be made effective, in whole or in part, by acts, words or printed matter.

The court's protective and restraining powers extend to every device whereby property is irreparably damaged or commerce is illegally restrained. To hold that the

restraint of trade under the Sherman anti-trust act, or on general principles of law, could be enjoined, but that the means through which the restraint was accomplished could not be enjoined would be to render the law impotent.

Society itself is an organization and does not object to organizations for social, religious, business and all legal purposes. The law, therefore, recognizes the right of workingmen to unite and to invite others to join their ranks, thereby making available the strength, influence and power that come from such association. By virtue of this right, powerful labor unions have been organized.

But the very fact that it is lawful to form these bodies, with multitudes of members, means that they have thereby acquired a vast power, in the presence of which the individual may be helpless. This power, when unlawfully used against one, cannot be met, except by his purchasing peace at the cost of submitting to terms which involve the sacrifice of rights protected by the Constitution; or by standing on such rights and appealing to the preventive powers of a court of equity. When such appeal is made it is the duty of government to protect the one against the many as well as the many against the one.

In the case of an unlawful conspiracy, the agreement to act in concert when the signal is published, gives the words "Unfair," "We don't patronize," or similar expressions, a force not inhering in the words themselves, and therefore exceeding any possible right of speech which a single individual might have. Under such circumstances they become what have been called "verbal acts," and as much subject to injunction as the use of any other force whereby property is unlawfully damaged. When the facts in such cases warrant it, a court having jurisdiction of the parties and subject-matter has power to grant an injunction.

Passing then to the consideration of the question as to whether the defendants disobeyed the injunction and were

therefore guilty of contempt, we are met with the objection that for want of a bill of exceptions we must treat the decree as conclusive as to the fact of disobedience, and can only examine the petition and the finding to determine whether one charges and the other finds acts which constitute a contempt of court. This view was adopted by the majority of the Court of Appeals, which treated this as a criminal proceeding, refused to examine the testimony and affirmed the judgment in analogy to the rule that on a general verdict of guilty upon an indictment containing several counts, some of which were bad, the conviction would not be reversed if there was one good count warranting the judgment.

That rule originated in cases where the finding of guilt was by the jury while the sentence was by the judge. In such cases the presumption is that the judge ignored the finding of the jury on the bad counts and sentenced only on those which were sufficient to sustain the conviction.

But there is no room for such presumption here. The trial judge made no general finding that the defendants were guilty. But in one decree he adjudged that each defendant was respectively guilty of the nine independent acts set out in separate paragraphs of the petition. Having found that each was guilty of these separate acts he consolidated the sentence without indicating how much of the punishment was imposed for the disobedience in any particular instance. We cannot suppose that he found the defendants guilty of an act charged unless he considered that it amounted to a violation of the injunction. Nor can we suppose that having found them guilty of these nine specific acts he did not impose some punishment for each. Instead, therefore, of affirming the judgment if there is one good count, it should be reversed if it should appear that the defendants have been sentenced on any count which, in law or in fact, did not constitute a disobedience of the injunction.

But in making such investigation it is again insisted that this is a proceeding at law for criminal contempt, where the findings of fact by the trial judge must be treated as conclusive, and that our investigation must be limited solely to the question whether, as a matter of law, the acts of alleged disobedience set out in the finding constitute contempt of court.

This contention, on the part of the Bucks Stove & Range Company, prevents a consideration of the case on its merits, and makes it necessary to enter into a discussion of questions more or less technical, as to whether this was a proceeding in equity or at law. Where results so controlling depend upon proper classification, it becomes necessary carefully to consider whether this was a case at law for criminal contempt where the evidence could not be examined for want of a bill of exceptions; or a case in equity for civil contempt, where the whole record may be examined on appeal and a proper decree entered.

Contempts are neither wholly civil nor altogether criminal. And "it may not always be easy to classify a particular act as belonging to either one of these two classes. It may partake of the characteristics of both." *Bessette* v. *Conkey*, 194 U. S. 329. But in either event, and whether the proceedings be civil or criminal, there must be an allegation that in contempt of court the defendant has disobeyed the order, and a prayer that he be attached and punished therefor. It is not the fact of punishment but rather its character and purpose that often serve to distinguish between the two classes of cases. If it is for civil contempt the punishment is remedial, and for the benefit of the complainant. But if it is for criminal contempt the sentence is punitive, to vindicate the authority of the court. It is true that punishment by imprisonment may be remedial, as well as punitive, and many civil contempt proceedings have resulted not only in the imposition of a fine, payable to the complainant, but also

in committing the defendant to prison. But imprisonment for civil contempt is ordered where the defendant has refused to do an affirmative act required by the provisions of an order which, either in form or substance, was mandatory in its character. Imprisonment in such cases is not inflicted as a punishment, but is intended to be remedial by coercing the defendant to do what he had refused to do. The decree in such cases is that the defendant stand committed unless and until he performs the affirmative act required by the court's order.

For example: If a defendant should refuse to pay alimony, or to surrender property ordered to be turned over to a receiver, or to make a conveyance required by a decree for specific performance, he could be committed until he complied with the order. Unless these were special elements of contumacy, the refusal to pay or to comply with the order is treated as being rather in resistance to the opposite party than in contempt of the court. The order for imprisonment in this class of cases, therefore, is not to vindicate the authority of the law, but is remedial and is intended to coerce the defendant to do the thing required by the order for the benefit of the complainant. If imprisoned, as aptly said in *In re Nevitt*, 117 Fed. Rep. 451, "he carries the keys of his prison in his own pocket." He can end the sentence and discharge himself at any moment by doing what he had previously refused to do.

On the other hand, if the defendant does that which he has been commanded not to do, the disobedience is a thing accomplished. Imprisonment cannot undo or remedy what has been done nor afford any compensation for the pecuniary injury caused by the disobedience. If the sentence is limited to imprisonment for a definite period, the defendant is furnished no key, and he cannot shorten the term by promising not to repeat the offense. Such imprisonment operates, not as a remedy coercive in its

nature, but solely as punishment for the completed act of disobedience.

It is true that either form of imprisonment has also an incidental effect. For if the case is civil and the punishment is purely remedial, there is also a vindication of the court's authority. On the other hand, if the proceeding is for criminal contempt and the imprisonment is solely punitive, to vindicate the authority of the law, the complainant may also derive some incidental benefit from the fact that such punishment tends to prevent a repetition of the disobedience. But such indirect consequences will not change imprisonment which is merely coercive and remedial, into that which is solely punitive in character, or *vice versa.*

The fact that the purpose of the punishment could be examined with a view to determining whether it was civil or criminal, is recognized in *Doyle* v. *London Guarantee Co.,* 204 U. S. 599, 605, 607, where it was said that "While it is true that the fine imposed is not made payable to the opposite party, compliance with the order relieves from payment, and in that event there is no final judgment of either fine or imprisonment. . . . The proceeding is against a party, the compliance with the order avoids the punishment and there is nothing in the nature of a criminal suit or judgment imposed for public purposes upon a defendant in a criminal proceeding." *Bessette* v. *Conkey,* 194 U. S. 328; *In re Nevitt,* 117 Fed. Rep. 448; *Howard* v. *Durand,* 36 Georgia, 359; *Phillips* v. *Welch,* 11 Nevada, 187.

The distinction between refusing to do an act commanded,—remedied by imprisonment until the party performs the required act; and doing an act forbidden,— punished by imprisonment for a definite term; is sound in principle, and generally, if not universally, affords a test by which to determine the character of the punishment.

In this case the alleged contempt did not consist in the defendant's refusing to do any affirmative act required,

but rather in doing that which had been prohibited.  The·
only possible remedial relief for such disobedience would
have been to impose a fine for the use of complainant,
measured in some degree by the pecuniary injury caused
by the act of disobedience.  Rapalje on Contempt,
§§ 131–134; *Wells* v. *Oregon Co.*, 19 Fed. Rep. 20; *In re
North Bloomfield Co.*, 27 Fed. Rep. 795; *Sabin* v. *Fogarty*,
70 Fed: Rep. 483.

But when the court found that the defendants had done
what the injunction prohibited, and thereupon sentenced
them to jail for fixed terms of six, nine and twelve months,
no relief whatever was granted to the complainant, and
the Bucks Stove & Range Company took nothing by that
decree.

If then, as the Court of Appeals correctly held, the
sentence was wholly punitive, it could have been properly
imposed only in a proceeding instituted and tried as for
criminal contempt.  The question as to the character of
such proceedings has generally been raised, in the appel-
late court, to determine whether the case could be re-
viewed by writ of error or on appeal.  *Bessette* v. *Conkey*,
194 U. S. 324.  But it may involve much more than mere
matters of practice.  For, notwithstanding the many ele-
ments of similarity in procedure and in punishment, there
are some differences between the two classes of proceed-
ings which involve substantial rights and constitutional
privileges.  Without deciding what may be the rule in
civil contempt, it is certain that in proceedings for crimi-
nal contempt the defendant is presumed to be innocent,
he must be proved to be guilty beyond a reasonable doubt,
and cannot be compelled to testify against himself.  *Boyd*
v. *United States*, ·116 U. S. 616; *United States* v. *Jose*, 63
Fed. Rep. 951; *State* v. *Davis*, 50 W. Va. 100; *King* v.
*Ohio Ry.*, 7 Biss. 529; *Sabin* v. *Fogarty*, 70 Fed. Rep. 482,
483; *Drakeford* v. *Adams*, 98 Georgia, 724.

There is another important difference.  Proceedings for

civil contempt are between the original parties and are instituted and tried as a part of the main cause. But on the other hand, proceedings at law for criminal contempt are between the public and the defendant, and are not a part of the original cause. The Court of Appeals recognizing this difference held that this was not a part of the equity cause of the *Bucks Stove & Range Company* v. *The American Federation of Labor et al.,* and said that: "The order finding the defendants guilty of contempt was not an interlocutory order in the injunction proceedings. It was in a separate action, one personal to the defendants, with the defendants on one side and the court vindicating its authority on the other."

In this view we cannot concur. We find nothing in the record indicating that this was a proceeding with the court, or, more properly, the Government, on one side and the defendants on the other. On the contrary, the contempt proceedings were instituted, entitled, tried, and up to the moment of sentence treated as a part of the original cause in equity. The Bucks Stove & Range Company was not only the nominal, but the actual party on the one side, with the defendants on the other. The Bucks Stove Company acted throughout as complainant in charge of the litigation. As such and through its counsel, acting in its name, it made consents, waivers and stipulations only proper on the theory that it was proceeding in its own right in an equity cause, and not as a representative of the United States, prosecuting a case of criminal contempt. It appears here also as the sole party in opposition to the defendants; and its counsel, in its name, have filed briefs and made arguments in this court in favoring affirmance of the judgment of the court below.

But, as the Court of Appeals distinctly held that this was not a part of the equity cause it will be proper to set out in some detail the facts on this subject as they appear in the record.

In the first place the petition was not entitled "United
States *v.* Samuel Gompers, *et al.*" or "*In re* Samuel
Gompers, *et al.*," as would have been proper, and accord-
ing to some decisions necessary, if the proceedings had
been at law for criminal contempt.   This is not a mere
matter of form, for manifestly every citizen, however un-
learned in the law, by a mere inspection of the papers in
contempt proceedings ought to be able to see whether it
was instituted for private litigation or for public prosecu-
tion, whether it sought to benefit the complainant or
vindicate the court's authority.   He should not be left in
doubt as to whether relief or punishment was the object
in view.   He is not only entitled to be informed of the
nature of the charge against him, but to know that it is a
charge and not a suit.   *United States* v. *Cruikshank*, 92
U. S. 542, 559.

Inasmuch, therefore, as proceedings for civil contempt
are a part of the original cause, the weight of authority is
to the effect that they should be entitled therein.   But the
practice has hitherto been so unsettled in this respect that
we do not now treat it as controlling, but only as a fact to
be considered along with others as was done in *Worden* v.
*Searls*, 121 U. S. 25, in determining a similar question.
Thus considering it we find that the petition instituting
the contempt proceeding was entitled in the main cause
"*Bucks Stove & Range Company, plaintiff,* v. *The Ameri-
can Federation of Labor, et al., defendants, No. 27,305,
Equity,*" and that the answers of the defendants, every
report by the examiner in chancery, every deposition,
motion and stipulation, every order—including the final
decree and the amended decree, were all uniformly en-
titled in the equity cause.   Not only the pleadings in the
original cause but all the testimony, oral and written, was,
by reference in the petition, made a part of the contempt
proceedings.   The trial judge quoted largely from this
oral testimony thus introduced in bulk, and the severity

and character of the sentence indicate that he was largely influenced by this evidence which disclosed the great damage done to the complainant's business by the boycott before the injunction issued.

It is argued the defendants' answers concluded with a statement that as questions of criminal and quasi-criminal intent were involved, a jury was better qualified to pass on the issues than a judge, and in the event he should be of opinion that the charges had not been sworn away, they moved that issues of fact should be framed and submitted to a jury. Such a motion was not inconsistent with the theory that this was a proceeding for civil contempt in equity, but was in strict accord with the practice under which questions of fact may be referred by the chancellor to a jury for determination.

In proceedings for civil contempt the complainant, if successful, is entitled to costs. Rapalje on Contempt, § 132. And evidently on the theory that this was a civil proceeding and to be governed by the rules applicable to an equity cause, the Bucks Stove & Range Company moved the court to amend the decree so as to award to it "its costs." After argument by solicitors for both parties, the motion was granted, and the court adjudged that the complainant do recover against the defendants its costs in said contempt proceeding. This ruling was no doubt correct as this was a civil case, but could not have been granted in a proceeding for criminal contempt, where costs are not usually imposed in addition to the imprisonment. Where they are awarded they go to the Government, for the use of its officers, as held by Justice Miller, on circuit. *Durant* v. *Washington County,* 4 Woolw. 297.

In another most important particular the parties clearly indicated that they regarded this as a civil proceeding. The complainant made each of the defendants a witness for the company, and, as such, each was required to tes-

tify against himself—a thing that most likely would not have been done, or suffered, if either party had regarded this as a proceeding at law for criminal contempt—because the provision of the Constitution that "no person shall be compelled in any criminal case to be a witness against himself" is applicable, not only to crimes, but also to quasi-criminal and penal proceedings. *Boyd* v. *United States,* 116 U. S. 616.

Both on account of the distinct ruling to the contrary by the Court of Appeals, and the importance of the results flowing from a proper classification, we have with some detail discussed the facts appearing in the record, showing that both parties treated this as a proceeding which was a part of the original equity cause. In case of doubt this might, of itself, justify a determination of the question in accordance with the mutual understanding of the parties, and the procedure adopted by them. But there is another and controlling fact, found in the brief but sufficient prayer with which the petition concludes. We have already shown that in both classes of cases there must be allegation and proof that the defendant was guilty of contempt, and a prayer that he be punished. The classification then depends upon the question as to whether the punishment is punitive, in vindication of the court's authority, or whether it is remedial by way of a coercive imprisonment, or a compensatory fine payable to the complainant. Bearing these distinctions in mind, the prayer of the petition is significant and determinative. After setting out in detail the acts of alleged disobedience, the petition closes with the following prayers: (1) "that the defendants show cause why they should not be adjudged in contempt of court and be punished for the same," and (2) "that petitioner may have such other and further relief as the nature of its case may require."

"Its case,"—not the Government's case. "That petitioner may have relief"—not that the court's authority

may be vindicated. The Bucks Stove & Range Company was not asserting the rights of the public, but seeking "such other and further relief as the nature of its case may require." If it had asked that the defendants be forced to pay a fine to the Government, or be punished by confinement in jail, there could have been no doubt that punishment pure and simple was sought.

On the other hand, if it had prayed that the court impose a fine payable to· the Bucks Stove & Range Company, the language would have left no doubt that remedial punishment was sought. It is not different in principle, if, instead of praying specifically for a fine payable to itself, it asks generally for "such relief as the nature of its case may require." In either event such a prayer was appropriate to a civil proceeding, and under it the court could have granted that form of relief· to which the petitioner was entitled. But as the act of disobedience consisted not in refusing to do what had been ordered, but in doing what had been prohibited by the injunction, there could be no coercive imprisonment, and therefore the only relief, if any, which "the nature of petitioners case" admitted, was the imposition of a fine payable to the Buck's Stove & Range Company.

There was therefore a departure—a variance between the procedure adopted and the punishment imposed, when, in answer to a prayer for remedial relief, in the equity cause, the court imposed a punitive sentence appropriate only to a proceeding at law for criminal contempt. The result was as fundamentally erroneous as if in an action of "A. *vs.* B. for assault and battery," the judgment entered had been that the defendant be confined in prison for twelve months.

If then this sentence for criminal contempt was erroneously entered in a proceeding which was a part of the equity cause, it would be necessary to set aside the order of imprisonment, examine the testimony and thereupon

make such decree as was proper, according to the practice in equity causes on appeal. And, if upon the examination of the record it should appear that the defendants were in fact and in law guilty of the contempt charged, there could be no more important duty than to render such a decree as would serve to vindicate the jurisdiction and authority of courts to enforce orders and to punish acts of disobedience. For while it is sparingly to be used, yet the power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law. Without it they are mere boards of arbitration whose judgments and decrees would be only advisory.

If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the "judicial power of the United States" would be a mere mockery.

This power "has been uniformly held to be necessary to the protection of the court from insults and oppressions while in the ordinary exercise of its duties, and to enable it to enforce its judgments and orders necessary to the due administration of law and the protection of the rights of suitors." *Bessette* v. *Conkey*, 194 U. S. 324, 333.

There has been general recognition of the fact that the courts are clothed with this power and must be authorized to exercise it without referring the issues of fact or law to another tribunal or to a jury in the same tribunal. For if there was no such authority in the first instance there would be no power to enforce its orders if they were disregarded in such independent investigation. Without authority to act promptly and independently the courts could not administer public justice or enforce the rights of private litigants. *Bessette* v. *Conkey*, 194 U. S. 337.

Congress in recognition of the necessity of the case has

also declared (Rev. Stat., § 725) that the courts of the United States "shall have power to punish by fine or imprisonment contempts of their authority . . . " including "disobedience . . . by any party to any lawful order . . . of the said courts." But the very amplitude of the power is a warning to use it with discretion, and a command never to exert it where it is not necessary or proper. For that reason we can proceed no further in this case because it is both unnecessary and improper to make any decree in this contempt proceeding.

For on the hearing of the appeal and cross appeal in the original cause in which the injunction was issued, it appeared from the statement of counsel in open court that there had been a complete settlement of all matters involved in the case of *Bucks Stove & Range Company* v. *The American Federation of Labor et al.* This court therefore declined to further consider the case, which had become moot, and those two appeals were dismissed. 219 U. S. 581. When the main case was settled, every proceeding which was dependent on it, or a part of it, was also necessarily settled—of course without prejudice to the power and right of the court to punish for contempt by proper proceedings. *Worden* v. *Searls,* 121 U. S. 27. If this had been a separate and independent proceeding at law for criminal contempt, to vindicate the authority of the court, with the public on one side and the defendants on the other, it could not, in any way, have been affected by any settlement which the parties to the equity cause made in their private litigation.

But, as we have shown, this was a proceeding in equity for civil contempt where the only remedial relief possible was a fine payable to the complainant. The company prayed "for such relief as the nature of its case may require," and when the main cause was terminated by a settlement of all differences between the parties, the complainant did not require and was not entitled to any

compensation or relief of any other character. The present proceeding necessarily ended with the settlement of the main cause of which it is a part. *Bessette* v. *Conkey,* 194 U. S. 328, 333; *Worden* v. *Searls,* 121 U. S. 27; *State* v. *Nathans,* 49 S. Car. 207. The criminal sentences imposed in the civil case, therefore, should be set aside.

The judgment of the Court of Appeals is reversed, and the case remanded with directions to reverse the judgment of the Supreme Court of the District of Columbia and remand the case to that court with direction that the contempt proceedings instituted by the Bucks Stove & Range Company be dismissed, but without prejudice to the power and right of the Supreme Court of the District of Columbia to punish by a proper proceeding, contempt, if any, committed against it.

*Reversed.*