## LOMBARDO v. UNITED STATES.

Court of Appeals of District of Columbia.

Submitted October 1, 1928. Decided November 5, 1928.

No. 4693.

Austin F. Canfield and Robt. I. Miller, both of Washington, D. C., for appellant.

Peyton Gordon, Leo A. Rover, and Neil Burkinshaw, all of Washington, D. C., for the United States.

Before MARTIN, Chief Justice, and ROBB and VAN ORSDEL, Associate Justices.

ROBB, Associate Justice. Appeal from a judgment in the Supreme Court of the District, wherein appellant was found guilty of contempt of court and sentenced to imprisonment in the Washington Asylum and Jail for a period of 45 days.

On the 28th of June, 1927, Joseph A. Vitalle was put on trial in the Supreme Court of the District before Mr. Justice James F. Smith under indictments, consolidated for the trial, charging him with the crime of assault with a dangerous weapon upon his wife, Ruth Vitalle, and Harry A. Nelligan. Before the noon recess, the court instructed the jurors not to talk to any person or persons about the case. On this point the following statement of the court, contained in the bill of exceptions, is pertinent:

"I took particular pains in the Vitalle case to charge the jury very earnestly not to talk about the case, and to permit no one to talk to them about it. I did so because I had my doubts as to whether I ought not to lock the jury up, in view of the circumstances of the case, and the feeling that was manifested by both sides. There was such feeling, and the charge was so serious that I would have been warranted in putting the

jury where it could not be approached. I did not want to do that, and consequently I strenuously charged the jury not to let anybody talk to them about the case, or to talk about it among themselves."

Appellant, brother-in-law of the accused, had been in constant attendance at the morning session of the trial. At the commencement of the noon recess he went outside of the courthouse and was standing at the foot of the steps, when a juror, Edward S. Fuller, with whom he was acquainted, approached him and asked him what he was doing there, to which he replied, "Nothing." Another juror, a Mr. Lambath, joined them, and as the three were walking along the street (appellant being next to Fuller) appellant, according to Fuller's testimony, said to Fuller, in effect, that it was his (appellant's) brother-in-law who was on trial, and that his brother-in-law's family were trying to railroad him. Fuller replied: "You know, we are not supposed to say anything about this case." To this appellant made no reply, and shortly announced that he was going up to the barber shop, where he was employed. The juror Lambath heard the conversation between appellant and Fuller, but it was in such a low tone that he could not distinguish what was said.

Appellant took the stand and admitted that he was in court during the forenoon, but denied that he heard the court caution the jurors against permitting any one to talk with them. He further testified that, when Fuller asked him what he was doing in court, he replied: "I am up to court here in my brother-in-law's case. That is my brother-in-law, and I think they are trying to send him down." Asked what he meant by the expression, "I think they are trying to send him down," he replied, "Well, I meant his wife and the man that he cut was trying to send him down to jail." On cross-examination the witness admitted that he heard a Miss Hensley testify, and, upon interrogation by the court, repeated the material part of her testimony. He also admitted that he heard the judge say something to the jury just before he left the bench, but did not hear what the judge said; that the courtroom was quiet at that time. Several witnesses testified to appellant's reputation for honesty and integrity.

Thereupon counsel for appellant moved the court to discharge the rule for contempt and release the defendant, the ground of the motion being that the government had failed to prove the offense beyond a reasonable doubt.

In denying the motion, the court said:

"Now, it is not a question of reasonable doubt in this case, and that is the distinction I drew; that this is not a crime as ordinarily crime is contemplated, where the jury have to pass upon the question. * * * There is nothing of that kind here. Of course, every man is presumed to be innocent—contempt cases usually take place around the courthouse, but with the juror and the man making the approach alone. The juror does his duty, and when he tells a story that is perfectly reasonable under all the circumstances in the case, must I ignore it because the defendant denies it? Why, that would be perfectly impossible; you can see what might happen under the rule that the courts have laid down, that the good character of a defendant may by itself be sufficient to raise a reasonable doubt. I do not believe I am bound by that rule."

In announcing his conclusions on the evidence, the court further said: "Well, of course, there is but one thing first for me to determine, and that is: Did Mr. Lombardo speak to Mr. Fuller, the juror, and say to him: 'That is my brother-in-law's case. They are trying to railroad him to prison.' How am I to determine that? As Mr. Canfield has aptly said: 'Why, I must have some evidence to show that, and it is the duty of the government to prove it.'

"Have they proved it? The defendant takes the stand, and he says that he said: 'They are trying to send my brother-in-law down.' Which of these two witnesses ought to be believed as to what was the language that was used? Well, we have on one side Mr. Fuller. Not a speedy witness. Not one who has come forward and made a charge against the defendant, but a reluctant witness, who was brought to a knowledge of his duty after the jury had been commanded to speak to nobody about this case.

"On the other side you have Mr. Lombardo, who, of course, has a decided interest. His liberty, in a measure, is at stake.

"Of course, I have to take into consideration also the surrounding circumstances in determining the credibility of these two witnesses. Every man charged with an offense has the feeling of a child, and the only weapon that he has ordinarily to shield himself from punishment is his tongue. The accused has taken the stand, and there isn't any question but that he has been a good citizen. He testified, and stated in his answer that he did not hear the court charge the jury. * * *

"Mr. Lombardo took the stand and said

that he was seated in the back of the courtroom, and that he could not hear what I said to the jury. Nobody has ever accused me of being a low-voiced man, yet Lombardo says he did not hear me, but did hear the low-voiced woman talking from the witness stand and repeated practically all of her material testimony. I must take that anomaly into account in determining the credibility of Mr. Lombardo and what weight I shall give to his testimony.

"Between Lombardo and Fuller I must believe Fuller. There is nothing in Fuller's testimony or in his attitude towards the case that would lead me to believe that he told a falsehood, or had any motive for telling an untruth, or any interest which could be served by bringing Lombardo to punishment. I see nothing of that kind in the case.

"Now, of course, reasonable doubt does not cut much figure here. Cutting out all the judicial precedents on reasonable doubt, which ordinarily tend to befuddle jurors, but from which no judge dares to depart— a reasonable doubt is a reasonable doubt, a doubt founded on reason. How do you get the facts in any case so that you are satisfied beyond a reasonable doubt? By human testimony. Well, what witnesses am I now going to believe? Those that I think that I ought to believe, whose conduct, whose attitude on the stand, and all that sort of thing, convinces me that they are telling the truth, or those whose testimony leaves me unconvinced of its truthfulness?

"Reasonable doubt does not cut any figure in this case. But, if it did, then I am very free to confess to you all that I am deciding this case on the preponderance of credible testimony, nothing else. That is what I am deciding it upon. * * *

"I find in this case: That the witness Fuller was a juror duly sworn in to try the case of United States v. Vitalle. That Rosario Lombardo is his brother-in-law. That he knew Fuller, and, according to the testimony, had known him for about three years. That he spoke to Fuller in his barber shop, because he knew he was a juror for the first time, he himself says, and that he wanted to find out what the words 'Oyez! Oyez!' meant. That that is the reason he spoke to him and asked him whether he was a juror, or whether this was the first time he knew he was a juror. And the court finds that therefore he knew that he was a juror.

"In the second place he was present in court and saw him in the box. That he was present when the court instructed the jury on no account to permit anybody to talk to them about the case, or to talk about it among themselves. That he heard that instruction to the jury. That he met the juror outside of the courtroom, on the steps of the courthouse, and that the juror spoke to him and said, 'Hello, Joe, what are you doing here?' That they walked down the street, either together or apart, and that finally Rosario Lombardo said to Fuller, 'That is my brother-in-law they are trying, and they are trying to railroad him to prison.'

"From those facts I am confronted with the proposition as to what was the intention of the party. I cannot determine what a person's intention is, except by what he does and what he says. Intention is in the mind, but what the intention of the party is is to be determined by his acts. The statement of that kind to a juror, 'They are trying to railroad my brother-in-law to prison,' had but one meaning, and that was that they were trying to send an innocent man to prison. That of itself exercises an influence on the mind of the juror. It cannot help but do it. It could not help but do it with the court, with a judge. It has its influence. I must hold that it was the intention of this party to do the things which his words would convey to the mind of the juror. I therefore find the defendant guilty of the contempt. * * * "

Counsel for the government frankly concede that in criminal contempt, as in criminal cases, the presumption of innocence obtains and that proof of guilt must be beyond a reasonable doubt (see Gompers v. Buck's Stove & Range Co., 221 U. S. 418, 31 S. Ct. 492, 55 L. Ed. 797, 34 L. R. A. [N. S.] 874; Michaelson v. United States ex rel. Chicago, St. Paul, Minneapolis & Omaha Railway Co., 266 U. S. 42, 45 S. Ct. 18, 69 L. Ed. 162, 35 A. L. R. 451); but counsel insist that, in view of the court's review of the evidence and findings of fact, the court's observation that "reasonable doubt does not cut any figure in this case" was mere dicta and did not prejudice appellant.

A careful reading of the court's statement of the evidence and specific findings of fact irresistibly leads to the conclusion that the court's observations concerning the applicability of the rule of reasonable doubt were academic, and that, in fact, the court was convinced beyond a reasonable doubt of appellant's guilt. Appellant knew that Fuller was a juror, and yet, according to appellant's admission, he spoke to Fuller about the case. As to just what was said, there is little conflict between Fuller and appellant, and the trial court specifically found, and

gave cogent reasons for the finding, that as between appellant and Fuller he believed Fuller. For the reasons stated in detail, the court found that appellant heard the court's admonition to the jury. But one element remained for consideration—appellant's intent; on this point the court said:

"I cannot determine what a person's intention is, except by what he does and what he says. Intention is in the mind, but what the intention of the party is is to be determined by his acts. The statement of that kind to a juror, 'They are trying to railroad my brother-in-law to prison,' had but one meaning, and that was that they were trying to send an innocent man to prison. That of itself exercises an influence on the mind of the juror. * * * I must hold that it was the intention of this party to do the things which his words would convey to the mind of the juror. I therefore find the defendant guilty of the contempt."

It clearly appearing, notwithstanding the general observations of the court concerning the rule of reasonable doubt, that actually the court correctly applied the rule, the error complained of was harmless error, within the meaning of section 269 of the Judicial Code, as amended by the Act of February 26, 1919, 40 Stat. 1181 (section 391, tit. 28, USCA).

Judgment affirmed.

Affirmed.