A. FINK & SON

*v.*

THE BUTCHERS' UNION, No. 422, OF NEWARK, N. J., et al.

[Decided July 24th, 1915.]

Where the employes of a firm engaged in the manufacture of provisions and meats have gone on a strike because their employer has determined to maintain an open shop, and have conspired, in conjunction with a butchers' union and others, to establish a boycott against him and his products by means of the distribution of cards, circulars and posters, containing untrue statements and threatening and offensive language, among the employer's customers, urging them not to buy his products, enforced by intimidation and personal threats, and by inducing union workmen not to deal with such customers, whereby the employer's business is greatly injured, an injunction will issue to restrain such acts, the purpose of defendants being, not to legitimately advance their own interests, but to coerce the employer to comply with their wishes by ruining his business.

On motion for preliminary injunction.

*Mr. Clark McK. Whittemore* and *Mr. Abram H. Cornish,* for the motion.

*Mr. Henry Carless, contra.*

HOWELL, V. C.

The bill in this case is filed to prevent the defendants from maintaining a boycott against the complainant and the wares and merchandise which it manufactures and deals in. The complainant is a New Jersey corporation, having its principal office and place of business in Newark. It manufactures and produces provisions of various kinds, principally meats and sausages, and its customers are widely spread over that portion of the state which lies adjacent to Newark. It has about $250,000 invested in the business, and its total sales prior to the strike of its em-

ployes in January last was of the value of about $100,000 a month. The principal stockholders of the company are stockholders of a corporation doing a similar business in the county of Hudson, and up to the early part of January last both the Jersey City factory and the Newark factory were union shops, that is to say, the workmen were all union men and the work was done in accordance with the union rules. Owing to some difficulty between the Hudson county company and its employes, which caused a strike there, the complainant determined that its factory or shop should no longer be conducted as a union shop, but that after the first Monday of January, 1915, it should be conducted as an open shop, that is to say, open to union men and non-union men on equal terms, and as the men left their work at the end of the week they were told to come back on the following Monday to work, at the same wages and under the same conditions as theretofore, but that the shop thereafter would be an open shop. Thereupon nearly all of the men went on a strike, leaving only about twenty-five out of the whole number of seventy-five in the complainant's employ. Shortly after the complainant succeeded in filling the vacancies and has gone on with its business, but the strike, accompanied by a boycott, has continued down to the time of the filing of the bill.

The bill alleges that the defendants, or some of them, have combined together and agreed among themselves and with the officers and delegates of the union, known as local union No. 422 of Newark, New Jersey, and the Essex trades council and its affiliated unions, and with butchers' union local No. 190 of Hudson county, for the purpose of causing all the persons who were purchasing the complainant's products, and dealing with the complainant in the ordinary course of business, to stop making such purchases and to refrain altogether from business dealings with the complainant; that they have agreed and combined together to effectuate this purpose by means of persuasion, intimidation and annoyance, by the use of intimidating, offensive language and threats to boycott the complainant's merchandise and products, by printing and distributing cards, circulars and posters containing threatening and offensive language, by employing or securing persons to go from house to house to call on

families of union working men who deal with the complainant's customers, to induce such customers to refrain from dealing with the complainant, by means whereof certain of the persons who were and had been dealing with the complainant and purchasing its goods and merchandise have altogether suspended such dealing, and that others have been obliged to curtail their purchases from the complainant as a result of the unlawful acts of the defendants; that the complainant's business has been greatly damaged, and during the two months next preceding the filing of the bill had fallen off nearly $22,000. Copies of the printed matter used by the defendants in their campaign of persuasion, coercion and intimidation are annexed to the bill. The fact that they have been circulated in the manner set out in the bill is tacitly admitted, or at least is not denied, the denials in relation thereto reaching only to denials that certain named individuals or associations were responsible therefor. The statement that the circulars were not addressed to the public, but were addressed only to members of the union, appear on the face of the exhibits to be untrue. They are a constant appeal to the "consuming public in general" and to business people who purchase or sell meat products. A large number of them contain the statement that the complainant locked out its men, and a sympathetic appeal is addressed to the public generally in their favor on account of having been driven from their work in mid-winter and without warning, a statement which, so far as the papers in this case show, is untrue. The exhibits call upon the public generally to abstain from using the complainant's products, and many instances are shown in which retail dealers who have for years been customers of the complainant have been threatened with ruination of their business; in many cases members of the union and former employes of the complainant have visited the localities of retail dealers who have been in the habit of purchasing goods of the complainant and have there distributed cards and circulars calling upon such retail dealers and the public to refrain from buying complainant's meat, and in some cases men have paraded in front of such retail dealers' places of business for a day at a time with placards suspended from their shoulders advising the public generally not to buy the complainant's

products. There was one poster which was quite largely used which was printed in red ink and contained at the top a skull and cross-bones in a frame, and under it these words, "A Fink & Son's products are unfair to organized labor," with a union label at the bottom showing that it was printed by a union shop. This is, perhaps, the most distinctive specimen of intimidating matter produced in the case. That it is intimidating and was intended to have that effect is apparent at the slightest glance. Accompanying some of their circulars were lists of retail dealers and others who were regular customers of the complainant, and the appointment of committees was requested to visit these people and induce them to stop patronizing the complainant and to desist from purchasing its goods. In other cases cards, which are called market cards, and which are given by the unions to retail butchers to show that they are in sympathy with organized labor, have been taken from the butchers for the reason that they would not submit to intimidation by the defendants. One of the characteristic cards reads as follows (*Exhibit E*):

"Notice to the meat buying public. We, the butcher union workmen of the city of Newark are compelled to take the following action against this meat market because our men have been locked out of A. Fink & Sons for over six weeks. O'Connor meat market, 48 Winans avenue, Newark, N. J., conducts a non-union meat market and sells A. Fink & Sons non-union products, which are not under the government inspection, therefore you do not know what you are buying for your money."

Cards of that same sort were printed and distributed, with a mere change of name, against Oscar Leonhardt, O'Connor's meat market, Benedict's meat market and Schlesinger's meat market. Enough has been said to show the general character and nature of the printed matter used by the defendants in their boycotting campaign against the complainant. To go further would be superfluous. All these things are universally held to be unlawful. They constitute together a cause of action based upon a conspiracy entered into by the defendants for the purpose of ruining the business of the complainant and its customers, not for the benefit of the unions or their policies; not because there is in contemplation any sort of influence on the labor market,

41

but to maliciously interfere with and ruin the business men and stop their sales in whom and in which they have no interest whatever, in order to drive the complainant into compliance with their wishes. I need only cite the cases of *Barr* v. *Essex Trades Council, 53 N. J. Eq. 101; Martin* v. *McFall, 65 N. J. Eq. 91; Jonas Glass Co.* v. *Glass Bottle Association, 72 N. J. Eq. 653; affirmed, 77 N. J. Eq. 219; Quinn* v. *Leathem (1901), A. C. 495; 70 L. J. P. C. 76; Bucks Stove and Range Co.* v. *Gompers, 221 U. S. 418.* In *Quinn* v. *Leathem* the decision makes a distinction which puts actions of the defendants in this class of cases upon the proper ground. "In *Allen* v. *Flood (1898), A. C. 1, 67; L. J. Q. B. 119,* the purpose of the defendant was by the acts complained of to promote his own trade interests which it was held he was entitled to do although injurious to his competitors, whereas in the present case, while it is clear there was combination, the purpose of the defendants was to injure the plaintiff in his trade as distinguished from the intention of legitimately advancing their own interests." It is quite clear that in the case at bar the action of the defendants consisted of a conspiracy or combination to injure not only the complainant but all persons who, as merchants or otherwise, dealt in or purchased the complainant's products. If it were lawful to go so far as this there is no limit to the mischief to the public which such combination and confederacy would not reach to. It would go to the extent of forbidding an absolutely disinterested person from purchasing or eating meat prepared by the complainant— a most absurd proposition.

An injunction order should therefore issue restraining the defendants from instituting or maintaining a boycott against the complainant and the products of its factories. It appeared at the argument that some of the defendants were not served with copies of the bill and the order to show cause. In so far as these persons have not appeared voluntarily they cannot be held. There are, likewise, some of the individual defendants who have denied all complicity in the unlawful action charged by the bill. These denials, however, are in a stereotyped form and as such have very little weight. It is very much the same as if twenty witnesses should be produced before a court and each one should

swear to the same set of facts in the same words. Suspicion would be at once aroused at such uniformity of action and a jury could not be criticised if it disregarded the same altogether.

Another defence was set up. In December, 1913, it is alleged, the complainant made an agreement with Butchers' Union, No. 422, that it would unionize its shop or factory upon condition that the union would undertake to advertise the complainant's business and bring in new customers; that in pursuance of such agreement the union did so advertise the complainant's business and brought many new customers, whose names are given in the affidavits. This statement, however, is categorically denied by the manager of the complainant's business, who is alleged to have made the agreement, and, further, it was proved that all the persons claimed to have been introduced as new customers of the complainant were, in fact, old customers antedating the proposed agreement. Even if this were not true, the agreement set out in the affidavit of Mr. Fred Meyer is so scrappy and incomplete that no cause of action could be founded on it, nor can it be used for the purpose of exemplifying the maxim, "He who asks equity must do equity."

Upon the settlement of the order I will determine against whom the injunction should issue.