IN THE MATTER OF THE APPEAL OF WILLIAM P. VERDON FROM AN ORDER ADJUDGING HIM GUILTY OF CONTEMPT OF THE HUDSON COUNTY COURT OF QUARTER SESSIONS.

Argued March 16, 1918—Decided June 7, 1918.

1. A proceeding for contempt, which has for one of its objects punishment of the contemner, is in its nature a criminal one, and must be governed by the rules applicable to the trial of criminal causes, and the proof must establish the delinquency beyond a reasonable doubt.

2. In a proceeding to punish defendant for contempt of court, the defendant denied, under oath, the contumacious statement attributed to him and testified to by a witness, and in his denial he was fully corroborated by the testimony of a disinterested witness who was present at the interview between the defendant and the witness who had testified to the contumacious statement alleged to have been made. *Held*, that the burden cast upon the state to establish the defendant's guilt beyond a reasonable doubt was not sustained.

On appeal from Hudson County Quarter Sessions.

Before GUMMERE, CHIEF JUSTICE, and Justices PARKER and KALISCH.

For the state, *George T. Vickers* and *Robert H. McCarter*.

For the defendant, *Arthur B. Archibald* and *Alexander Simpson*.

The opinion of the court was delivered by

KALISCH, J.   William P. Verdon was found guilty of contempt of the Court of Quarter Sessions of the County of Hudson, and that court upon such conviction sentenced him to pay a fine of $250 and to be committed to the county jail for thirty days.

From that judgment an appeal was taken, under the act of 1884, to the Supreme Court, where it was held that the procedure adopted by the court below to punish Verdon for contempt was unauthorized in law, and without rehearing the matter of contempt of which he stood convicted, upon the law and upon the facts, the Supreme Court reversed the conviction.   *In re Verdon*, 89 *N. J. L.* 16.

Thereupon the attorney-general sued out a writ of error in the Court of Errors and Appeals, which tribunal reversed the judgment of the Supreme Court and remitted the record to that court in order that it may rehear the matter of contempt upon which the conviction was founded, both upon the law and upon the facts, in the manner directed by the statute. *Attorney-General* v. *Verdon*, 90 *N. J. L.* 494, 497.

From the history of the proceedings against Verdon, as revealed by the record before us, it appears that his conviction of contempt in the court below necessarily and solely rested upon testimony introduced by the prosecution, as a result of an attack made by Verdon upon the validity of the procedure taken against him, and in consequence of which he remained mute and offered no testimony in exculpation of the charge laid against him.

The Court of Errors and Appeals declared, in *Attorney-General* v. *Verdon, supra,* that the legal effect of the statute of 1884 is to afford a person convicted of contempt in the court of first instance, upon an appeal to this court, a trial *de novo.*

In this posture the appeal has been heard and considered by us. Leave was given to either side to take depositions to be used upon the rehearing. By stipulation of counsel the testimony taken in the court below, in the original proceedings, was made part of the record, to be used upon the rehearing. The only additional testimony taken by the prosecution was that of Mr. Ivins, editor of the "Hudson Dispatch."

For the alleged contemner testimony was introduced, for the first time, on this hearing. His defence is a denial that he gave the information contained in the article upon which the proceeding for contempt against him was founded; and he furthermore insists that he neither inspired the article nor participated in its publication.

The article was published in the "Hudson Dispatch" on Monday, January 17th, 1916, and was made the basis of the rule to show cause issued by the court below why Verdon should not be adjudged guilty as of contempt of the Court of General Quarter Sessions of the County of Hudson. It appears that one Byrne, a newspaper reporter, testified that he had written the article in question, and that he obtained the information therein contained from Verdon, on Saturday, January 15th, 1916, either in the afternoon or evening, at the latter's residence, in the presence of a man by the name of Taylor.

Verdon, testifying in his own behalf, while admitting that Byrne called and sought an interview with him relating to the case of one Smith, then pending in the court below, and which case became and was the subject-matter of the contumelious article, states with positiveness that he told Byrne that he had no interview to give out and that he had nothing to say. Verdon further testified that during the time that Byrne remained, the latter talked about his work for various newspapers in Hudson county.

James Taylor, the person referred to by Byrne as being present when Verdon gave the information contained in the article in question, was called as a witness by the defendant, testified that he was present when Byrne called at Verdon's residence for an interview and remained until Byrne went away, the witness accompanying him; that Byrne remained about twenty minutes, and that at no time during the presence of the witness did Verdon give an interview to Byrne pertaining to a proposed impeachment of Judge Tennant, in connection with the case of Samuel Smith; that the witness heard Byrne say, "I came to get an interview on the impeachment," and Verdon's reply, "I have nothing at all to say; absolutely nothing at all to say;" that Byrne asked Verdon whether he was going to Trenton on Monday, and the latter replied that he had nothing at all to say.

Byrne was dead when the rehearing was ordered, but his testimony taken in the original proceedings in the court below was read into the present record. Byrne testified that his interview with Verdon lasted for more than two hours. It further appears from his testimony that he attended the Smith trial and gathered impressions from what was said and occurred there. It does not appear that he took any notes in writing of the interview, and the inference to be gathered from his testimony is that he relied upon his memory of what had been said when he wrote the article. For when he was asked by counsel of the state to point out any part of the article which he identified as emanating from him and not from Verdon, he said: "I say it is a very difficult thing to do, because I go there and put questions to the man and he answers me and I gather my impressions from that. Wherein I quote him directly, with quotation marks, it is to be assumed, of course, that he said everything that is said there. But, in the other part of the article, to say that every idea, every thought contained in this article was obtained from Mr. Verdon—it is impossible to say that, because something might be retained in my mind from the Smith trial. It does not purport to quote Mr. Verdon from beginning to end."

This witness further testified that the article, however, represented truthfully the substance of the interview.

In this posture of the evidence we are called upon to determine whether the state has sustained the burden of proof which the law casts upon it.

The sole object of the proceeding instituted against the defendant is to punish him for having inspired and participated in the publication of an article, in a newspaper, reflecting upon the dignity of the court below and tending to obstruct the proper administration of law.

In *Thompson* v. *Pennsylvania Railroad Co.*, 48 *N. J. Eq.* 105, 108, Vice Chancellor Pitney said: "Proceedings in contempt are of two classes, namely, first, those instituted solely for the purpose of vindicating the dignity and preserving the power of the court. These are criminal and punitive in their nature, and are usually instituted by the court in the interest of the general public and not of any particular individual or suitor."

The learned Vice Chancellor cites in support of this legal proposition *Dodd* v. *Una*, 40 *N. J. Eq.* (at *p.* 714), per Mr. Justice Depue; *People* v. *Oyer and Terminer*, 101 *N. Y.* 245; *Rap. Contempt* 21.

The present proceeding, being in its very nature a criminal one, it must be governed by the legal rules applicable to the trial of criminal causes.

In *Barnett Foundry Co.* v. *Crowe*, 80 *N. J. Eq.* 109, which was a proceeding for contempt for the violation of an injunction order, Vice Chancellor Howell, in discussing the nature of the proceeding, and the legal rules controlling the same, on pages 110 and 111, stated them to be as follows: "It is a well-known principle in contempt proceedings that a respondent shall not be adjudged guilty of contempt if there is a reasonable doubt on the facts and on the law as to his guilt. The proceeding is *quasi*-criminal, and, in so far as it is so, it must carry with it the usual and ordinary presumptions that would affect the proceeding if it were being conducted in the criminal court."

And even in cases where the proceedings were *inter partes*

and resorted to for remedial purposes, it was held that the proceedings being *quasi*-criminal in character, the proof must clearly establish the delinquency charged. *Magennis* v. *Parkhurst,* 4 *N. J. Eq.* 433; *McClure* v. *Gulick,* 17 *N. J. L.* 340.

In *Staley* v. *South Jersey Realty Co.,* 83 *N. J. Eq.* 300, Mr. Justice Garrison, speaking for the Court of Errors and Appeals, in an instructive and illuminating opinion, discusses civil and criminal contempts and their essential characteristics and differences, and (on *p.* 307), in commenting upon the case of *Gompers* v. *Buck's Stove and Range Co.,* 221 *U. S.* 418, and, quoting therefrom, says: " 'There are some differences,' said the court in that case 'between the two classes of proceedings which involve substantial rights and constitutional privileges. Without deciding what may be the rule in civil contempts, it is certain that in proceedings for criminal contempt the defendant is presumed to be innocent, he must be proved to be guilty beyond a reasonable doubt and cannot be compelled to testify against himself,' citing a large number of cases.

"It is hardly necessary to add that among these substantial rights is that the defendant's guilt must be proved by judicial evidence, *i. e.,* by testimony to which the ordinary rules of evidence are applied."

Subjecting the evidence before us to the test of these legal rules, we are forced to the conclusion that the state failed to establish the guilt of the defendant beyond a reasonable doubt. We have not reached this result without having carefully and duly considered all the matters urged by the state as establishing clear proof of the defendant's guilt. First, it is argued by counsel of the state that since it appears that in the original proceeding in the court below Verdon was present when Byrne testified that he received the information contained in the published article from the former, and because Verdon did not take the witness-stand to deny the statement, but remained silent, it was such conduct on Verdon's part as to give rise to the inference that what Byrne said as to the former's connection with the article was true. While the law recognizes such a salutary rule of circumstan-

tial evidence, and under ordinary circumstances it would have lent great force to the contention made, in so far as the action of the court below was concerned, it loses its cogency here, for two reasons, namely—*first,* because it appears that the cause of the defendant's silence in the court below arose from the fact that he challenged the validity of the proceedings which involved the jurisdiction of that court, and *secondly,* because the proceedings here being *de novo,* and the defendant having under oath in this court made a complete denial of his connection with the origin and publication of the article, it becomes the duty of the court to consider and decide the case upon the law and upon the facts as presented to us on this appeal.

Secondly, for the state it is further argued that Byrne's testimony is corroborated by Mr. Ivins, the editor of the "Dispatch;" in that the latter testified that he directed Byrne to interview the defendant in regard to the subject-matter of the article; and is further corroborated, in that the interview did take place on Saturday, and that the article published on the succeeding Monday contained a statement that the defendant was going to Trenton on Monday and have certain court officials impeached, and that the defendant did go to Trenton on that Monday and made some effort to start proceedings for impeachment against certain public officials, and that he instigated a resolution to be offered to that effect in the legislature, and that these facts could not possibly have been known to Byrne unless communicated to him by Verdon.

Giving full force and effect to this contention, nevertheless, in contemplation of law, the evidence relied on fails to satisfy the burden cast upon the state to establish the defendant's guilt beyond a reasonable doubt, since it appears that Verdon, on oath, denied that he made the contumacious statements attributed to him, and in this denial he is fully corroborated by Taylor, a disinterested witness, who was present during the entire time of the interview between Byrne and Verdon.

It is also to be observed that the credibility of neither of these witnesses was impeached.

To sum up, it must be borne in mind that this is a criminal or *quasi*-criminal proceeding, in which the presumption of innocence remains with the defendant throughout the entire case, and that the burden of establishing his guilt beyond a reasonable doubt rests upon the state. In this respect, we think, the state has failed, and for this reason must find upon the law and upon the facts as developed before us the defendant not guilty, and order that the judgment below be reversed and for nothing holden.