Willie WILSON and Barbara
Wilson, Plaintiffs,

v.

Officer Steven VACCARO,
et al., Defendants.

No. 93 C 0687.

United States District Court,
N.D. Illinois,
Eastern Division.

April 19, 1995.

Robert E. Gordon, David R. Centracchio, Gordon & Gordon, Ltd., and Rick Allan White, Chicago, IL, for plaintiffs.

Thomas George DiCianni, Jennifer Ann Pritz, Ancel, Glink, Diamond, Cope & Bush, and Gregory E. Rogus and Martin A. Dolan, Segal, McCambridge, Singer & Mahoney, Ltd., Chicago, IL, for defendants.

*MEMORANDUM OPINION AND ORDER*

GETTLEMAN, District Judge.

This matter is before the court on defendants' petition for a rule to show cause why plaintiff Willie Wilson should not be held in contempt of court for procuring and suborning alleged perjured deposition testimony and an alleged perjured affidavit. The court has reviewed the papers submitted by the parties and has held an evidentiary hearing on the petition. Because of the serious nature of the charges raised by defendants, and the fact that these charges involve alleged complicity by one or more of plaintiffs' attorneys, the court will address the issue in detail.

### PROCEDURAL BACKGROUND

On February 2, 1993, plaintiffs Willie and Barbara Wilson filed this action against the defendant police officers, claiming damages arising from an alleged unlawful detention of Willie Wilson by the officers and others (the "Incident"). As alleged by plaintiffs, Mr. Wilson, who is African American and a correctional officer at the Federal Metropolitan Correctional Center in Chicago, was driving his late model Cadillac through Tinley Park, Illinois, when he was stopped by the police and detained while the police determined whether Mr. Wilson's car was stolen. It is uncontested that Mr. Wilson was in fact stopped, weapons were drawn, and Mr. Wilson was handcuffed, put in a squad car and detained while the check was made. Mr. Wilson claims that he was injured while being handcuffed, and that officer Steven Vaccaro put a gun to his head during the process. Mrs. Wilson joins the claim, alleging loss of consortium.

In July 1994, defendants' attorneys took Mr. Wilson's deposition. Based in part on Wilson's inability to identify the individual officers involved in the Incident and on alleged admissions made at this deposition, as well as legal arguments justifying the defendants' conduct, defendants filed a motion for summary judgment. In an effort to respond to that motion, Wilson moved to compel the production of photographs of the individual officers named in the complaint so he could show them to an alleged witness. In support of the motion to compel, Wilson submitted an affidavit by Steven Kocsak, the person who allegedly witnessed the Incident, and whose name had been disclosed in plaintiffs' answers to defendants' interrogatories filed in December 1993. Kocsak's affidavit stated that he witnessed the Incident and that he believed that could identify officers Nykaza and Kachlik and Sergeant Koschinitzky as being present and participating in the Incident.

The motion to compel was denied by Judge Lindberg (to whom this case was originally assigned), but defendants took Kocsak's deposition prior to any further briefing on the summary judgment motion. At this deposition, Kocsak again confirmed plaintiffs' version of the Incident, and identified various police officers who allegedly took part in the Incident through the identification of a series of photographs provided by defendants. During this deposition, Kocsak also testified that one Christopher Messina was with Kocsak at the time he witnessed the Incident, and further stated that he (Kocsak) did not know the whereabouts of Mr. Messina, but would attempt to locate him. (It is undisputed that this testimony was false, as will be discussed in more detail below.) Wilson relied upon Kocsak's deposition in his response to the motion for summary judgment.

The motion for summary judgment was referred to Magistrate Judge Bobrick for a report and recommendation. Judge Bobrick, after reviewing the motion papers in the light most favorable to plaintiffs (i.e., accepting plaintiff's version of the facts as true), recommended that the motion be granted as a matter of law. Plaintiffs timely filed objections to Judge Bobrick's report and recommendations. Those objections were again based in part upon Kocsak's deposition testimony.

Thereafter, one Rhonda Motill contacted Officer Vaccaro to say that she had information concerning Kocsak's testimony in this case, which she claimed was false. Vaccaro chose not to discuss the matter with her, but instead had one of his attorneys, Brian Bailey, contact Ms. Motill who, along with Mr. Messina, gave the following account in a

court reporter's statement, in a deposition taken by plaintiffs' counsel, and in testimony before the court.

### MOTILL'S AND MESSINA'S STORY

Motill and Messina had been living together as platonic roommates since at least August 1994. Kocsak, who was a close childhood friend of Messina, also lived with them for at least part of this time. Kocsak and Messina, both of whom are in their mid-twenties, have been in trouble with the law throughout most of their lives, and have had numerous run-ins with the Tinley Park police. They often worked together as mechanics for various employers on the suburban southwest side of the Chicago area, and in the late summer and early fall of 1994 were living together (along with Motill) in Cicero, Illinois. Messina was at that time on probation, having pled guilty to a possession of cannabis charge in state court. In or around December 1994, the three moved to Schererville, Indiana, apparently in order to get away from the problems that plagued them while they were living in Cicero and other Illinois venues.

According to Motill and Messina, in June 1994 Kocsak told Messina that he (Kocsak) had been cooperating with plaintiff Willie Wilson to help Mr. Wilson in this case. Kocsak, who allegedly admitted to Motill and Messina that he had not been present or otherwise witnessed the Incident, told them that he was going to testify that he witnessed the Incident, in return for which Wilson would share part of the proceeds that Mr. Wilson expected to recover in this action. Kocsak also solicited Messina to join him as a witness so that they could share in these expected proceeds together.

Messina has testified that he never agreed to become a false witness in this case, and continually "blew off" Kocsak's, and later Mr. Wilson's, attempts to conscript him into the scheme. Nevertheless, Messina claims to have had many conversations with both Koc-

sak and Wilson, including a number of meetings at Mr. Wilson's house, at which the alleged scheme was discussed. According to Messina and Motill, Kocsak talked about this matter constantly. At one point Mr. Wilson requested Motill also to become a false witness, which proposal she flatly rejected.

Messina also testified that on several occasions Mr. Wilson promised to buy Messina and Kocsak a garage from the proceeds he expected to receive as a result of this case (Motill remembers one such conversation). Kocsak also mentioned this promise on a number of occasions in attempting to solicit Messina to join the conspiracy. Messina and Motill also testified that prior to Kocsak's deposition Mr. Wilson told Kocsak in their presence how to identify the defendant police officers from photographs Mr. Wilson expected to be produced at Kocsak's deposition, and that Mr. Wilson, who would attend the deposition, would use hand signals to help Kocsak in this regard.

In September 1994 Messina and Motill accompanied Kocsak to downtown Chicago where he gave his deposition at the offices of Martin Dolan, attorney for some of the defendants. The three first went to the offices of plaintiffs' counsel, Gordon & Gordon, Ltd., where Kocsak met briefly with attorney Robert Gordon outside of Motill's and Messina's presence. Mr. Wilson was also present at Gordon's office. David Centracchio, an associate at Gordon & Gordon, accompanied the four when they left his office to go to Martin Dolan's office, where Mr. Kocsak's deposition was taken.

According to Motill and Messina, Messina was introduced at Gordon & Gordon to Mr. Centracchio by Mr. Messina's real name, after which Centracchio, Mr. Wilson and Kocsak told Mr. Messina not to reveal his true identity if he were introduced to any of the defendants' lawyers, because Kocsak intended to testify at his deposition that he did not know Messina's whereabouts.[1]

1. Although it is a bit unclear to the court as to why this charade, if true, would have been played, the court infers from Messina's and Motill's testimony that because Messina had not yet agreed, or definitively disagreed, to becoming a witness, Kocsak, and perhaps Mr. Wilson and his

attorney, wanted to keep their options open. Kocsak testified at the hearing before the court that Messina introduced himself as "John" to Centracchio because Messina never wanted to become involved as a witness in this case, and

Mr. Wilson, Centracchio, Kocsak, Messina and Motill all traveled from Centracchio's office to Dolan's office by foot, arriving at the latter location sometime after 6:00 p.m. Messina and Motill waited in Mr. Dolan's reception area while Kocsak gave his deposition. There is conflicting testimony about whether Messina was introduced to any of the defense attorneys as "John" or any other name. Centracchio testified that he was not introduced to Messina and did not know who Messina or Motill were. Mr. Dolan does not remember specifically being introduced to any of the people who accompanied Kocsak to the deposition, although he represented to the court that it is his usual practice to introduce himself to anyone visiting his office.

After Kocsak's deposition, according to Messina and Motill Mr. Wilson gave Kocsak $50. Kocsak testified that he merely asked Mr. Wilson for money for parking because he (Kocsak) had not received a witness fee. Mr. Wilson denies giving any money to Kocsak.

A few weeks after Kocsak's deposition, Mr. Wilson, Kocsak, Messina and Motill went to the scene of the Incident. Messina and Motill testified that the purpose of the visit was to re-enact the Incident for Messina, with Kocsak playing the part of Officer Vaccaro, in order to educate Messina about the Incident. Mr. Wilson denies that they re-enacted the Incident and Kocsak, who remembers visiting the scene, could not recall why he and the others did so.

After Kocsak, Messina and Motill moved to Indiana (which plaintiffs allege constitutes a violation of the terms of Messina's probation), Motill and Messina had a falling out with Kocsak. According to Motill and Messina, Kocsak beat Motill after she rejected sexual advances. Messina testified that he recalls seeing bruises on Motill's body, and Motill testified that she filed a criminal complaint with the local police, which she believes is still being investigated. Kocsak denies harming Motill or making sexual advances toward her. In addition, Motill and Messina testified that they found a "disgusting" video tape made by Kocsak. (Kocsak testified that he did not know the contents of

the video.) As a result of these incidents, Motill demanded that Kocsak leave the house, which he did.

## THE CONTEMPT PROCEEDINGS

After taking court reporter statements from Messina and Motill, defense counsel filed the instant petition for a rule to show cause, in which they requested a finding of contempt, monetary sanctions and attorneys' fees. In a subsequently filed memorandum of law, defendants requested the court to refer this matter to the United States Attorney or other specially appointed prosecutor for investigation and prosecution of criminal contempt charges. Defendants also submitted the *ex parte* court reporter's statements they had taken of Motill and Messina, as well as Kocsak's deposition transcript. Thereafter, Wilson's counsel took the depositions of Motill and Messina, which have also been submitted to the court. At Wilson's request, the court held an evidentiary hearing on this matter on April 6 and 7, 1995, at which Kocsak, Messina, Motill, Centracchio, Gordon, Willie Wilson, Vaccaro and others testified with respect to the allegations made by Motill and Messina.

At the evidentiary hearing, on direct examination, both Motill and Messina corroborated the story they had told to defendants' counsel as related above. On cross-examination by Mr. Gordon, Mr. Messina became truculent and resentful, and was unable to corroborate or provide detail to much of what he had testified to on direct examination. Based upon his testimony, the court finds that Mr. Messina is not the most credible of witnesses. Ms. Motill, on the other hand, testified clearly and cogently on both direct and cross-examination, and the court finds her to be a credible witness. Although her testimony is not as extensive as Messina's because she was not present at all the conversations among Kocsak, Wilson, and Messina, she testified that she witnessed Kocsak and Mr. Wilson discussing the false testimony and witnessed Mr. Messina being introduced under his own name to Centracchio,

that Kocsak lied at his deposition in order to

protect his friend.

but as "John" to one of the defendants' lawyers.

In Kocsak's testimony, he repeated that he was in fact present with Messina at the scene of the Incident, and described the Incident to the court. He admitted that he lied at his deposition, stating that he did so to protect the identity of his friend, Messina, who did not want to be involved as a witness. Kocsak denied ever being offered anything to give false testimony or discussing that subject with Messina or Motill. Based on his demeanor, the court finds that Mr. Kocsak is not a credible witness. In fact, Mr. Gordon, in closing statements to the court, argued that Kocsak, along with Motill and Messina, should not be believed. Kocsak is an admitted perjurer, and the court will strike both his affidavit and his deposition testimony with respect to any ruling on the merits in this case.

Willie Wilson also testified that he did not offer anything to anybody in return for false testimony. His version of the Incident is consistent with the version alleged in the complaint and testified to by Kocsak. The court does not at this time make any finding with respect to Mr. Wilson's credibility. Officer Vaccaro also testified, and denied that he ever put a gun to Mr. Wilson's head, or otherwise treated him improperly. According to Mr. Vaccaro, he observed Mr. Wilson's car make an illegal lane change, took down the license number, and reported it to headquarters, which notified him that the car was possibly stolen. This information later turned out to be incorrect, and when the officers who had detained Mr. Wilson learned of an error shortly after the detention, they released him immediately.[2]

### DISCUSSION

In their petition, defendants initially asked the court to: enter a finding of contempt against plaintiff; assess an appropriate fine against plaintiff as punishment for the contemptuous conduct of suborning and attempting to suborn perjury and to deter such conduct in the future; award defendants' counsel attorneys' fees for the preparation and attendance at Kocsak's deposition, the preparation and presentation of the petition for rule to show cause and any attendant legal services; any further relief that this court deems just. Some of the requested sanctions are remedial in nature (i.e., attorneys' fees), indicating that the defendants are pursuing this as a civil contempt. Others, such as a fine to serve as punishment, would indicate that defendants are pursuing this as a criminal contempt.

To clarify, the court asked the parties to submit briefs on the issue. In their brief, defendants suggest that they "initially seek a finding of *criminal* contempt against any of the individuals involved in the conduct alleged in the Petition. Thus, the Court should it find cause, is requested to forward this matter to the United States Attorney's office for prosecution of criminal contempt proceedings." (Emphasis in original.) Defendants have not waived (indeed they have specifically reserved) their right to pursue civil sanctions after disposition of any criminal proceeding.

The distinction between civil and criminal contempt is not always clear, particularly because the same act can constitute either. *Hecht v. Don Mowry Flexo Parts, Inc.*, 111 F.R.D. 6 (N.D.Ill.1986). The label is important, however, because it determines the procedures that must be followed, the amount of discretion the court can exercise, and the type of relief available. *Id.* at 8.

The label to be applied depends on "the nature of the relief sought and the purpose for that relief." *Id.* (quoting *Thompson v. Cleland*, 782 F.2d 719 (7th Cir. 1986)). Generally, a contempt sanction is considered civil if it is remedial in nature, i.e., it either coerces a defendant into compliance with a court order or compensates the complainant for losses sustained. Such sanctions may be imposed in an ordinary civil proceeding upon notice and opportunity to be heard. Neither a jury trial nor proof beyond a reasonable doubt is required. *International*

---

2. The above recitation of facts and evidence (which has been prepared from the court's notes, not a transcript) is not intended by the court to be complete or to constitute a definitive resolution of inconsistencies or conflicts in the testimony of the various witnesses.

*Union, United Mine Workers v. Bagwell,* —— U.S. ——, —— – ——, 114 S.Ct. 2552, 2556–57, 129 L.Ed.2d 642 (1994).

█ Criminal contempt, however, "is a crime in the ordinary sense, and criminal penalties may not be imposed on someone who has not been afforded the protections the Constitution requires of such criminal proceedings." *Id.* For serious criminal contempts, i.e., involving imprisonment of more than six months, those protections include the right to trial by jury. *Id.; Bloom v. Illinois,* 391 U.S. 194, 199, 88 S.Ct. 1477, 1481, 20 L.Ed.2d 522 (1968).

As noted by the Supreme Court, however, although the procedural contours of the two prongs of contempt are well established, the distinguishing characteristics of civil versus criminal contempts are somewhat less clear, and the stated purpose of a contempt sanction alone cannot be determinative of · the label (and, consequently, the procedural safeguards) to be applied. *Id.; Gompers v. Buck's Stove & Range Co.,* 221 U.S. 418, 441, 31 S.Ct. 492, 498, 55 L.Ed. 797 (1911). Most contempt sanctions, like most criminal punishments, to some extent punish a prior offense as well as coerce an offender's future obedience. Clearly, however, when a contempt sanction involves the prior conduct of an isolated, prohibited act, the resulting sanction has no coercive effect. "[T]he defendant is furnished no key, and he cannot shorten the term by promising not to repeat the offense." *Gompers,* 221 U.S. at 442, 31 S.Ct. at 498.

█ Such is the case here. The alleged offenses, subornation of perjury and, perhaps, the submission of perjured testimony to the court are both crimes independent of a contempt proceedings, 18 U.S.C. §§ 1622, 1623, and if true, no sanction that the court could impose could change the fact that the acts have been committed. The court concludes, therefore, that the petition for a rule to show cause alleges criminal contempt, at least in part, and will treat the matter as such. Accordingly, based on the evidentiary hearing, the court must decide whether to refer the matter to the United States Attorney for prosecution, pursuant to Fed. R.Crim.P. 42(b).

Plaintiffs' counsel argues that the court should deny the petition for rule to show cause and decline to refer this matter for prosecution. Plaintiffs claim that Motill and Messina were motivated to lie by their dislike for Kocsak, and by Messina's racism. (There is conflicting testimony as to the latter.) Plaintiffs also claim that because of Messina's alleged violation of the terms of his probation, he may be seeking to curry favor with the Tinley Park police by providing useful testimony in this case discrediting Wilson and Kocsak.

█ Unfortunately for plaintiffs and their counsel, these arguments are not persuasive. First, while there is no doubt hostility between Motill and Messina, on one hand, and Kocsak on the other, due to Kocsak's alleged mistreatment of Motill and the "disgusting" video tape, Motill has apparently taken appropriate steps by filing a criminal complaint against Kocsak and essentially ejecting him from her and Messina's lives. With respect to any alleged motive by Messina to do a favor for the Tinley Park police, the court notes that although there does not seem to be any love lost between them, by coming forward at this time Messina exposed his move to Indiana (the alleged basis for the probation violation) to the Tinley Park police in a manner that would likely never have come to light had he not stepped forward. It should also be noted that according to Messina's probation officer (called by plaintiffs as a witness), Messina's probation was terminated satisfactorily, and that Vaccaro knew nothing about the move to Indiana until Messina came forward to give his testimony in the contempt proceedings. Finally, the court notes that it was plaintiffs and plaintiffs' counsel who tendered Mr. Kocsak, who Mr. Gordon admits is a non-credible perjurer, as a witness in this case; they cannot now totally disown him.

The court must conclude, particularly in light of its determination that Motill's testimony was generally credible, that there is a sufficient factual basis that demands further investigation. If nothing else is clear concerning this matter, there is one inescapable, disturbing, truth: someone is lying in the

**264**

worst possible manner to the court, either in an affidavit, a deposition, in open court, or in all three.

### CONCLUSION

Accordingly, it is hereby ordered:

1. Pursuant to Fed.R.Crim.P. 42(b), the court refers this matter to the United States Attorney for investigation and possible prosecution of criminal contempt.

2. The court strikes Kocsak's affidavit and deposition testimony with respect to any decision on the merits of this case.

3. The court will hold in abeyance any sanctions based upon Fed.R.Civ.P. 11, abuse of discovery or violations of the discovery rules until the investigation by the United States Attorney, including any potential criminal or civil proceedings, is complete.

4. The court will resume consideration of the objections to Magistrate Judge's Bobrick's report and recommendation, and will rule by mail.