{¶ 1} This timely appeal comes for consideration upon the record in the trial court and the parties' briefs. Defendant-Appellant Percy Squire appeals the decision of the Mahoning County Court of Common Pleas which found him guilty of indirect criminal contempt of court for violating a temporary restraining order and ordered him to serve six days in jail. The issues before us are whether the trial court was legally entitled to find Squire in criminal contempt of court and whether the evidence supported a finding of criminal contempt. Because we conclude the trial court was entitled to find Squire in criminal contempt of court regardless of the validity of the underlying order, that the underlying order had not expired as a matter of law, and the evidence supports a finding that Squire was in criminal contempt of court, we affirm the trial court's decision.
 {¶ 2} This is the fifth appeal before this Court, in addition to an original action, arising out of the underlying case. Most of the following facts can be found in this court's recent opinion inCiticasters Co. v. Stop 26-Riverbend, Inc., 7th Dist. Nos. 00 CA 149, 00 CA 212, 2002-Ohio-2284 (Citicasters III). However, as many of them are relevant to this appeal, we will set them forth once again.
 {¶ 3} On May 20, 1998, Plaintiff-Appellee Citicasters Co. entered into an assets purchase agreement with Defendant-Appellee Stop 26-Riverbend, wherein Stop 26 agreed to sell to Citicasters certain assets associated with the ownership and operation of a radio station now known as WBTJ, 101.9 FM. The studio for 101.9 is located in Youngstown, Ohio, and the transmitter site is owned by Defendant-Appellee Esq. Communications, Inc. Purportedly there is substantial identity between the officers, directors, and shareholders of Stop 26 and Esq. Communications. Under the assets purchase agreement, Stop 26 agreed to cause Esq. Communications to convey ownership of the transmitter site to Citicasters. Pursuant to various promissory notes and amendments to the assets purchase agreement, Citicasters advanced to Stop 26 $1,725,000 of the $2,750,000 total purchase price. The advance was secured by a security interest on 101.9's assets.
 {¶ 4} In connection with the advance, the parties also entered into a Time Brokerage Account ("TBA") wherein, for a monthly fee of twelve thousand dollars, Stop 26 agreed to accept and broadcast programming supplied by Citicasters. Pursuant to federal regulations, the TBA was filed with the Federal Communications Commission. The TBA was to be in effect until the assets purchase agreement is either closed or terminated. Citicasters had broadcast its programming on 101.9 from June 30, 1998, until the events that sparked this lawsuit.
 {¶ 5} Citicasters filed a complaint in the Mahoning County Court of Common Pleas on June 20, 2000, and, on that same day, obtained a temporary restraining order against Stop 26. The complaint alleged Stop 26, on June 1, 2000, through its counsel and principal shareholder, Squire, advised Citicasters by letter that Stop 26 intended to resume operational control of 101.9 on or about June 11, 2000. That letter proposed that Stop 26 and Squire would confess judgment for the advanced payment and begin broadcasting on 101.9. Stop 26 had been broadcasting programming to Youngstown's adult African-American community, its target audience, on WRBP, 1440 AM, pursuant to the terms of another TBA with that station's owner. Stop 26 had intended to sell 101.9 to Citicasters and buy the 1440 station, but, due to its inability to obtain financing, Stop 26 had not been able to close either deal. The owner of 1440 eventually found another buyer for that station.
 {¶ 6} Citicasters objected to the proposal contained in Stop 26's June 1, 2000 letter. Therefore, on June 12, 2000, Stop 26 sent another letter indicating it was terminating the TBA, it intended to resume operations on 101.9 on June 21, 2000, and it would notify the FCC immediately that 101.9's call letters would change from WBTJ to WRBP on June 21, 2000. Citicasters rejected this proposal by letter dated June 13, 2000.
 {¶ 7} Although the parties continued to exchange letters, they remained at an impasse until Citicasters filed its complaint and obtained the TRO from the Mahoning County Court of Common Pleas. The trial court ordered the defendants be "restrained in any manner, either directly or indirectly, [from] interfering, obstructing, or disrupting [Citicasters] in broadcasting its programming from WBTJ, 101.9 FM or taking any actions in violation of [Citicasters'] rights under its Time Brokerage Agreement." Stop 26 immediately removed the case to the United States District Court, Northern District of Ohio, Eastern Division, and filed a motion to dissolve the TRO. After a conference with the parties, the federal court issued an order on June 21, 2000, dissolving the TRO and setting up a schedule whereby Citicasters would be permitted to move to reinstate the TRO and/or remand the case to state court. The parties subsequently represented to the federal court that they had agreed to temporarily maintain the status quo while they attempted to work out a mutually agreeable solution. They requested the filing deadlines be extended to July 7, 2000, and the federal court issued an order to that effect.
 {¶ 8} On June 29, 2000, Squire, acting on the behalf of Stop 26, met with representatives of Citicasters to discuss proposals concerning alternatives for consummating the acquisition of 101.9. Citicasters indicated its willingness to work with Stop 26 toward a mutual solution. It agreed to a material reduction of the amount of Stop 26's outstanding promissory note obligations to Citicasters, provided Stop 26 would be able to negotiate similar agreements with its principal secured creditors and provided further that such reduction would permit the transfer of 101.9's assets to Citicasters free and clear of all third party claims.
 {¶ 9} In response to Stop 26's stated desire to resume broadcasting to its target audience in the Youngstown area, Citicasters offered to sell Stop 26 several radio stations in Youngstown. This sale would be contingent upon several matters, including Stop 26's ability to obtain financing for the transaction and Stop 26's ability to concurrently close the purchase of 101.9.
 {¶ 10} Notwithstanding Squire's expressed appreciation for Citicasters' attempts to resolve the matter, by letter dated June 30, 2000, Squire proposed to pre-empt thirty percent of Citicasters' programming beginning on July 1, 2000. This letter indicated Squire would not implement any changes if Citicasters disclosed its plans within a reasonable time. Although Citicasters responded by telephone within two hours, its programming was completely pre-empted by Stop 26's programming beginning on July 1, 2000, at approximately 6:58 p.m. local time.
 {¶ 11} On June 30, 2000, after receiving Squire's letter, Citicasters believed it was being threatened with the loss of his programming on 101.9 and, in anticipation of what it deemed an eventuality, began, at about 12:35 p.m., simulcasting its 101.9 programming, a product Citicasters calls "The Beat", on 95.9 FM. Stop 26 viewed and continues to view that simulcasting as a violation of C.F.R. § 73.3556, giving Stop 26 the right, under paragraph four of the TBA, to cancel Citicasters' programming on 101.9.
 {¶ 12} On July 3, 2000, Citicasters filed a motion for temporary restraining order and motion to remand in the federal court. The federal court heard the motions and, in a July 6, 2000 decision and order, found the case had been improperly removed to federal court and remanded the case to the Mahoning County Court of Common Pleas. The federal court found the case involved a breach of contract claim and did not implicate any federal questions. The United States Sixth Circuit Court of Appeals declined to review the decision and denied a petition for writs of prohibition and mandamus filed by Stop 26.
 {¶ 13} On remand, Citicasters filed an amended and supplemental complaint and a motion to reaffirm and continue the TRO. On July 21, 2000, the trial court issued an order reaffirming and continuing the TRO. Stop 26 and Esq. Communications appealed this order to this court. That appeal was dismissed for lack of a final, appealable order inCiticasters Co. v. Stop 26-Riverbend, Inc. (Aug. 17, 2000), 7th Dist. No. 00 CA 144 (Citicasters I).
 {¶ 14} On July 25, 2000, Citicasters filed a motion requesting an order to show cause why Stop 26 and Esq. Communications should not be held in contempt for violating the TRO. The same day, the trial court issued the requested order.
 {¶ 15} On July 27, 2000, Stop 26 and Esq. Communications filed a motion to dismiss and a memorandum concerning the trial court's order to show cause. Stop 26 and Esq. Communications argued the trial court lacked subject matter jurisdiction and the proper place for the case was in federal court.
 {¶ 16} The same day, the trial court heard Citicasters' motion for contempt. At the hearing, Citicasters' counsel alleged Stop 26 and Esq. Communications had refused to allow Citicasters' programming to be aired in violation of the TRO. Squire, appearing on behalf of Stop 26 and Esq. Communications, admitted the companies had not complied with the trial court's order. He reiterated his argument that the trial court lacked subject matter jurisdiction. Squire also expressed surprise that he individually had been made a part of the contempt motion.
 {¶ 17} At the conclusion of the hearing, the trial court found both Stop 26 and Esq. Communications in contempt of court and ordered those companies to begin broadcasting Citicasters' programming pursuant to the TBA by 3:00 p.m. The trial court also fined the companies ten thousand dollars per day beginning July 22, 2000, and continuing each day until they were in compliance with the TRO. Stop 26 and Esq. Communications appealed this decision to this court. This court found the trial court's subject matter jurisdiction had been fully litigated in both federal court and by this court and that Stop 26 and Esq. Communications were precluded from raising those arguments again.Citicasters III, ¶ 29-33. This court also found the fines imposed by the trial court were not excessive. Citicasters III, ¶ 37-63.
 {¶ 18} Concerned that Squire did not have adequate notice he personally was included in the show cause order, the trial court deferred the issue of Squire's contempt for a hearing on a later date. That same day, the trial court issued an order for Squire to show cause why he should not be held in contempt for violating the TRO and set the matter for a hearing.
 {¶ 19} The following day, July 28, 2000, the trial court issued another show cause order after Citicasters' counsel informed the court of further non-compliance with the TRO. Citicasters later filed a formal notice of non-compliance on July 31, 2000. This order was directed to the officers, directors, and shareholders of Stop 26 and Esq. Communications. The companies appealed this order to this court. That appeal was dismissed for lack of a final, appealable order. SeeCiticasters Co. v. Stop 26-Riverbend, Inc. (Aug 22, 2000), 7th Dist. No. 00 CA 154, (Citicasters II).
 {¶ 20} On July 31, 2000, Stop 26 and Esq. Communications filed an emergency petition for a writ of prohibition with this court. This court dismissed that petition, finding Stop 26 and Esq. Communications failed to demonstrate the trial court exercised judicial power unauthorized by law. See State ex rel. Stop 26-Riverbend, Inc. v. Krichbaum (Aug. 17, 2000), Mahoning App. No. 00 CA 153. However, that same day this court issued a stay of execution of the contempt sanctions against Stop 26 and Esq. Communications on the condition that the companies post a five-hundred dollar bond and comply with the TRO.
 {¶ 21} On September 21, 2000, the trial court held a hearing on its order for Squire to show cause why he should not be held in contempt for violating the TRO. Squire was represented by counsel at the hearing. Citicasters' counsel recited the history of the case and referred to Squire's previous admission of non-compliance with the TRO. The trial court found Squire in contempt of court, fined him one thousand five hundred dollars, and ordered him to pay the reasonable costs incurred by Citicasters in proceeding on the motion to show cause. Squire appealed that decision to this court and his appeal was consolidated with Stop 26 and Esq. Communications's appeal into Citicasters III. On appeal, this court found 1) the trial court had subject matter jurisdiction over Squire; 2) Squire's conviction was not against the manifest weight of the evidence, was constitutional, and was lawful; and, 3) the trial court's actions were not arbitrary, capricious or evidence an attitude of enmity, malice, or ill will toward Squire. Citicasters III, ¶ 67-91.
 {¶ 22} On October 10, 2000, Stop 26 and Esq. Communications filed an answer, a counterclaim, and a third-party complaint naming the chairman and commissioners of the FCC as third-party defendants. Subsequently, those third-party defendants had the action removed to federal court. The federal court then remanded the case back to state court on February 26, 2001. Although the record does not clearly state what happened in federal court, motions and memorandum filed after February 26, 2001, indicate the federal court dismissed Stop 26 and Esq. Communications' claims against the third-party defendants and this dismissal was the basis for the remand.
 {¶ 23} The next day, on February 27, 2001, Citicasters moved for another order to show cause why Squire should not be held in contempt for violating the TRO from November 12, 2000, until November 17, 2000. After numerous continuances, Squires filed a memorandum opposing that motion on April 2, 2001. On April 13, 2001, the trial court granted Citicasters' motion and ordered Squires to show cause why he should not be held in contempt for violating the TRO and set a date for hearing. After the hearing, the trial court found Squire knew of the TRO and had already been punished for "indirect civil contempt". It concluded the evidence at the hearing established beyond a reasonable doubt that Squires personally committed acts which violated the TRO and sentenced him to serve six days in jail and to pay for the costs of the action. It is from this judgment that Squires now appeals.
 {¶ 24} Before we can address the substance of Squire's assignments of error, we must address two preliminary issues. First, in its brief to this Court, Citicasters argues Squire's failure to include the State of Ohio as a party and serve a copy of his brief on the Mahoning County Prosecutor renders the appeal improper. Therefore, Citicasters argues the Appellant's Brief should be stricken and this appeal should be dismissed. The sole basis for Citicasters' assertion that this appeal is improper is its argument that Squire was convicted of criminal contempt. Therefore, Citicasters argues, the prosecutor must be involved in the case.
 {¶ 25} This argument assumes a finding of indirect criminal contempt is a criminal action. However, contempt proceedings are regarded as sui generis; they are neither wholly civil nor wholly criminal actions. Brown v. Executive 200, Inc. (1980), 64 Ohio St.2d 250, 253, 18 O.O.3d 446, 416 N.E.2d 610. "They bear some resemblance to suits in equity, to criminal proceedings and to ordinary civil actions; but they are none of these." Cincinnati v. Cincinnati Dist. Council 51 (1973),35 Ohio St.2d 197, 202, 64 O.O.2d 129, 299 N.E.2d 686. For instance, certain statutory procedures applicable to purely criminal proceedings, such as indictment, arraignment, plea, and trial by jury, are not necessary procedures in cases of criminal contempt. State v. Local Union5760, United Steelworkers of America (1961), 172 Ohio St. 75, 83, 15 O.O.2d 133, 173 N.E.2d 331, overruled on other grounds in Brown, supra.
 {¶ 26} Appellate courts have repeatedly allowed parties to appeal from the imposition of sanctions resulting from a finding of criminal contempt without the involvement of the local county prosecutor's office. See State ex rel. Corn v. Russo, 90 Ohio St.3d 551, 2001-Ohio-0015, 740 N.E.2d 265; Brown, supra; Calex Corp. v. UnitedSteelworkers of Am. (2000), 137 Ohio App.3d 74, 738 N.E.2d 51; In reBrewer, 7th Dist. No. 99 CO 29, 2001-Ohio-3196. Contempt proceedings may be similar to criminal proceedings, but their purpose is much different. A contempt proceeding arises out of the inherent power of a court to enforce its own orders. Brewer at ¶ 18 citing State ex rel. Edwardsv. Murray (1976), 48 Ohio St.2d 303, 305, 2 O.O.3d 446, 358 N.E.2d 577. The only interested parties to the proceeding are the parties in the case and the court. As the violation of a court order is not a criminal offense, a prosecutor's office will have no interest in the outcome of the case. Therefore, there is no reason for them to be a party to the appeal. Accordingly, Citicasters' assertion that Squire's brief must be stricken and his appeal dismissed is incorrect.
 {¶ 27} Secondly, we chide Squire and his counsel for their misrepresentation of the facts to this court. In his brief, Squire states the trial court's order "reaffirming and continuing" the TRO was issued while the federal action was pending and before the federal stay of the TRO was lifted. However, it is clear from the record that the trial court's actions were taken after the federal district court had remanded the case and after the federal circuit court declined to review the decision and denied Stop 26's petition for writs of prohibition and mandamus.
 {¶ 28} In order to maintain trust within the legal community, lawyers are bound to tell courts the truth. Disciplinary Counsel v.Greene, 74 Ohio St.3d 13, 1995-Ohio-0097, 655 N.E.2d 1299; DR 1-102(A)(4). There is nothing more important to the proper resolution of an appeal than the facts underlying that appeal. Misrepresentation of a pivotal fact can drastically alter the outcome of a case. Accordingly, the Ohio Supreme Court has repeatedly disciplined attorneys for intentionally misrepresenting facts to a court in order to effect a desired result to benefit a party. Cleveland Bar Assn. v. Knowlton, 81 Ohio St.3d 76, 1998-Ohio-0583, 689 N.E.2d 538; Disciplinary Counsel v. Bandy,81 Ohio St.3d 291, 1998-Ohio-0509, 690 N.E.2d 1280; Disciplinary Counselv. Fowerbaugh, 74 Ohio St.3d 187, 1995-Ohio-0261, 658 N.E.2d 237;Greene, supra; Stark Cty. Bar Assn. v. George (1976), 45 Ohio St.2d 267, 74 O.O.2d 425, 344 N.E.2d 132.
 {¶ 29} In this case, the misrepresentation of the facts found in Squire's brief to this court combined with Squire's repeated and blatant disregard for the trial court's orders which will be discussed below is, to say the least, disturbing. It demonstrates a lack of regard for the functions and purposes of our judicial system. However, although a resolution of whether Squire may be punished for his disregard of the TRO is central to this appeal, his misrepresentation of the underlying facts in this case is not. Fortunately we can glean the facts from the record ourselves.
 {¶ 30} Turning to the substance of Squire's three assignments of error, in his first he asserts:
 {¶ 31} "The trial court erred to the substantial prejudice of Appellant by convicting him of criminal contempt for violating the temporary restraining order [T.R.O.] between November 12-17, 2000 when said T.R.O. (1) was improperly issued in the first instance (2) had expired as a matter of law after having been in place without an adversary hearing for seventy-five (75) days as of November 12, 2000, (3) was sought by Citicasters's [sic] as a part of an on-going plan, scheme or design to violate federal law, and (4) was imposed by the trial court in part for the purpose of insulating its rulings from appellate review."
 {¶ 32} In this assignment of error Squire presents four issues for review: 1) whether his conviction for contempt was improper because the underlying TRO was improper; 2) whether his conviction for contempt was improper because the TRO had expired by operation of law; 3) whether his conviction for contempt was improper because Citicasters had an improper motive in seeking the TRO; and, 4) whether his conviction for contempt was improper because the TRO was issued in order to insulate the trial court's rulings from appellate review. As Squire makes the same argument in relation to the first and third issues presented for review within this assignment of error, they will be addressed together.
 {¶ 33} Squire argues he could not have been found guilty of criminal contempt for violating the TRO since the TRO violated federal law. Decisions in contempt proceedings lie within the discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. Denovchek v. Board of Trumbull County Commrs. (1988),36 Ohio St.3d 14, 16, 520 N.E.2d 1362. An abuse of discretion connotes more than an error of law or judgment; it implies the trial court acted unreasonably, arbitrarily, or unconscionably. Blakemore v. Blakemore
(1983), 5 Ohio St.3d 217, 219, 5 OBR 481, 450 N.E.2d 1140. A trial court abuses its discretion only when "the result [is] so palpably and grossly violative of fact and logic that it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason, but rather of passion or bias."Huffman v. Hair Surgeon, Inc. (1985), 19 Ohio St.3d 83, 87, 19 OBR 123,482 N.E.2d 1248.
 {¶ 34} Contempt of court is the disobedience of a court order.Windham Bank v. Tomaszczyk (1971), 27 Ohio St.2d 55, 56 O.O.2d 31,271 N.E.2d 815, paragraph one of the syllabus. Disobedience of a court order brings the administration of justice into disrespect and tends to embarrass, impede, or obstruct a court in the performance of its functions. Id. "The power of contempt is inherent in a court, such power being necessary to the exercise of judicial functions." Denovchek, supra at 15. "Hence, the power to punish for contempt is said '* * * to exist independently from express constitutional provision or legislative enactment.'" Arthur Young Co. v. Kelly (1990), 68 Ohio App.3d 287,293, 588 N.E.2d 233, quoting Cincinnati, supra at 202.
 {¶ 35} A finding of contempt is reviewed on two different levels.State v. Kilbane (1980), 61 Ohio St.2d 201, 203, 15 O.O.3d 221,400 N.E.2d 386. First, the contemptuous conduct must be examined to see whether it constituted a direct or indirect contempt. Id. Second, the trial court's treatment of the matter must be analyzed in order to ascertain whether the contemnor was dealt with under the court's civil or criminal contempt powers. Id.
 {¶ 36} The Ohio Supreme Court observed direct contempt is misbehavior "committed in the presence of or so near the court as to obstruct the due and orderly administration of justice, and punishment therefor may be imposed summarily without the filing of charges or the issuance of process." In re Lands (1946), 146 Ohio St. 589, 595, 33 O.O. 80, 67 N.E.2d 433; see also R.C. 2705.01 (Misbehavior in the presence of or so near the court or judge as to obstruct the administration of justice). By contrast, indirect contempt is misbehavior "committed outside the presence of the court but which also tends to obstruct the due and orderly administration of justice." Id. R.C. 2705.02
provides a list of acts that could amount to indirect contempt. Pertinent to this appeal is R.C. 2705.02(A) which provides:
 {¶ 37} "A person guilty of any of the following acts may be punished as for a contempt:
 {¶ 38} "(A) Disobedience of, or resistance to, a lawful writ, process, order, rule, judgment, or command of a court or officer[.]" Id.
 {¶ 39} It is well established that a trial court has the power to deal with direct contempt summarily. Kilbane at 204, footnote 4. However, when, as in this case, a judge has no personal knowledge of the alleged act of contempt because of its commission beyond the court's actual physical presence, the contempt is indirect and the trial court must strictly adhere to the procedure outlined in R.C. 2705.03 requiring a written charge, notice to the defendant of the charge, the opportunity for the defendant to be represented by counsel, and an adversary hearing upon the issues. Local Union 5760, supra at 82.
 {¶ 40} The second way contempt is classified is whether it is criminal or civil in nature. Of course, contempt proceedings are sui generis and, therefore, are neither wholly civil nor wholly criminal in nature. Brown, supra.
 {¶ 41} "The distinction between civil and criminal contempt is based on the character and purpose of the contempt sanctions. If sanctions are primarily designed to benefit the complainant through remedial or coercive means, then the contempt proceeding is civil. Often, civil contempt is characterized by conditional sanctions, i.e., the contemnor is imprisoned until he obeys the court order. Criminal contempt, on the other hand, is usually characterized by an unconditional prison sentence or fine. Its sanctions are punitive in nature, designed to vindicate the authority of the court." (Citations omitted) Denovchek, supra at 16.
 {¶ 42} In this case, the contempt proceedings were begun at the plaintiff's request in order to enforce compliance with the TRO. However, the memorandum in support of Citicasters' motion for an order to show cause clearly contemplates criminal contempt. It states, in relevant part,
 {¶ 43} "Citicasters believes that Percy Squire deliberately violated this Court's Order after having been held in contempt. It is not for Percy Squire, and [sic] attorney, to decide for himself whether he has to obey orders of this Court. This act deserves to be punished." (Emphasis added).
 {¶ 44} The trial court found Squire "deliberately disregarded a valid order", ordered him to serve a definite six-day jail term, and ordered him to pay the costs of the action "as punishment for his acts of indirect criminal contempt." As both Citicasters and the trial court intended these contempt proceedings to be punishment, they were criminal in nature.
 {¶ 45} It is a fundamental tenet of American law that a violation of a court order is still punishable as criminal contempt even if the order is set aside on appeal or if it is invalid. United States v. UnitedMine Workers of Am. (1947), 330 U.S. 258, 67 S.Ct. 677, 91 L.Ed.2d 884;Shamie v. Pontiac (C.A.6, 1983), 709 F.2d 1508; Corn, supra. In UnitedMine Workers, the United States Supreme Court found "impressive authority for the proposition that an order issued by a court without jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings." Id. at 293.
 {¶ 46} "If a party can make himself a judge of the validity of orders which have been issued, and by his own disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the "judicial power of the United States" would be a mere mockery." Id. at 290, quoting Gompers v. Bucks Stove Range Co.
(1911), 221 U.S. 418, 450, 31 S.Ct. 492, 55 L.Ed. 797.
 {¶ 47} The Court went on to note: "An injunction duly arising out of a court of general jurisdiction with equity powers upon pleadings properly invoking its action, and served upon persons made parties therein and within the jurisdiction, must be obeyed by them however erroneous the action of the court may be, even if the error be in the assumption of the validity of a seeming but void law going to the merits of the case. It is for the court of first instance to determine the question of the validity of the law, and until its decision is reversed for error by orderly review, either by itself or by a higher court, its orders based on its decision are to be respected, and disobedience of them is contempt of its lawful authority, to be punished." Id. at 293-294, quoting Howat v.Kansas (1922), 258 U.S. 181, 189-190, 42 S.Ct. 277, 66 L.Ed. 550.
 {¶ 48} Because a sanction for criminal contempt is designed to vindicate the authority of a court, violations of a court order may be punishable as criminal contempt even though the order is set aside on appeal or, through the underlying action, becomes moot. Id. at 294.
 {¶ 49} The Supreme Court was careful to distinguish criminal contempt from civil contempt. Because the purpose behind civil contempt is to benefit the complainant through remedial or coercive means, "[t]he right to remedial relief falls with an injunction which events prove was erroneously issued * * *." Id. at 295.
 {¶ 50} The Ohio Supreme Court has made similar findings. In a recent case, the question before the court was whether a party could be punished for contempt even though the underlying case had been voluntarily dismissed pursuant to Civ.R. 41(A)(1). Corn, supra. The court began by noting, "It is well established that where the parties settle the underlying case that gave rise to the civil contempt sanction, the contempt proceeding is moot, since the case has come to an end." Id. at 555, citing Gompers, supra. In Corn, the contempt proceedings were begun to compel compliance with the court's order and, therefore, were civil in nature. Id.
 {¶ 51} "However, when respondent learned that it was relators' practice to intentionally and systemically destroy records to prevent opposing counsel and the court from inquiring into his practices, the purpose of the contempt sanction was no longer restricted to coercing relators into complying with the court's orders. Instead, its purpose was to vindicate the authority of the judge and to punish relators if she found that their practices impeded the judicial process and frustrated the civil discovery rules. Thus, what began as a civil matter became criminal in nature." Id. 555-556.
 {¶ 52} The court then looked to federal decisions on the matter and concluded it "agree[d] with these federal authorities and [found] that a court may consider the collateral issue of criminal contempt even after the underlying action is no longer pending." Id. at 556
 {¶ 53} Although Corn is not directly on point, the reason why a court could punish a party for criminal contempt after the underlying action is no longer pending is the same reason it may punish a party for criminal contempt even if it is later decided that the court did not have subject matter jurisdiction over the case at hand. A court must be able to vindicate its authority. If a court were not allowed to do this, it would be rendered impotent and the party's actions would make a mockery of the court's judicial power. See United Mine Workers, supra; Gompers, supra. In this case, the trial court found Squire in criminal contempt of court. Thus, it has the power to vindicate its order regardless of the validity of the underlying TRO. Accordingly, Squire's first and third issues presented for review within this assignment of error are meritless.
 {¶ 54} In the second issue Squire presents within his first assignment of error, he argues he could not have been found guilty of contempt for violating a court order since the TRO had expired by operation of law. Pursuant to Civ.R. 65(A), a TRO issued without writtenor oral notice to the adverse party expires by its terms within such time after entry, not to exceed fourteen days, as the court fixes, unless, within the time so fixed the order, the court extends the TRO for one like period for good cause shown or unless the party against whom the order is directed consents that it may be extended for a longer period. In this case, Citicasters filed a motion for a TRO on June 20, 2000, the same day it filed its initial complaint, and the trial court granted that motion on that day. In its motion, Citicasters states "Stop 26 was notified of the filing of the Complaint and this Motion, and will be notified of the time and place for the hearing." However, when Stop 26 and Esq. Communications removed the case to federal court the next day, on June 21, 2000, that TRO was dissolved. When the case was remanded back to the Mahoning County Court of Common Pleas, Citicasters filed a motion to reaffirm and continue the TRO the trial court issued on June 20, 2000. In the memorandum attached to the motion, Citicasters averred that it faxed a copy of the motion and order to Squire and that Squire had participated in a conference call with counsel and the trial court earlier that day.
 {¶ 55} The above facts show Citicasters provided Stop 26, Esq. Communications, and Squire with notice of the TRO before the TRO was issued. Thus, the time limits found in Civ.R. 65(A) do not apply. For these reasons and contrary to Squire's argument, the TRO could not have expired by operation of law when Squire allegedly violated its terms on November 12, 2000 to November 17, 2000. Squire's second issue within this assignment of error is meritless.
 {¶ 56} In the fourth and final issue presented for review within his first assignment of error, Squire argues this court erred when it found the trial court's grant of the TRO was not a final, appealable order and urges this court to render a merit decision on the propriety of the TRO. As this court has previously rendered a decision on the finality and appealability of the TRO, resolution of this issue is governed by res judicata.
 {¶ 57} "Res judicata operates `to preclude the relitigation of a point of law or fact that was at issue in a former action between the same parties and was passed upon by a court of competent jurisdiction.' Stateex rel. Kroger Co. v. Industrial Commission of Ohio, 80 Ohio St.3d 649,651, 1998-Ohio-0174, 687 N.E.2d 768, quoting Consumers' Counsel v. Pub.Util. Comm. (1985), 16 Ohio St.3d 9, 10, 16 OBR 361, 475 N.E.2d 782. The doctrine of res judicata involves both claim preclusion (historically called estoppel by judgment) and issue preclusion (traditionally known as collateral estoppel). Grava v. Parkman Twp., 73 Ohio St.3d 379, 1995-Ohio-0331, 653 N.E.2d 226. When an issue is fully litigated by the parties, a party is precluded from re-litigating the issue. See State v.Bey, 85 Ohio St.3d 487, 491, 1999-Ohio-0283, 709 N.E.2d 484.
 {¶ 58} In this case, this court has already concluded the TRO was not a final, appealable order that could be reviewed on its merits.Citicasters I. If Squire disagreed with this court's decision, then he should have either asked this court to reconsider its decision or appealed this court's determination to the Ohio Supreme Court at the time our determination was made. Squire cannot collaterally attack our previous determination now in a subsequent appeal. Squire's final argument within this assignment of error is meritless.
 {¶ 59} In summation, Squire's first and third arguments within this assignment of error fail because Squire was found guilty of criminal contempt and the propriety of the underlying order is irrelevant to a criminal contempt proceeding. His second argument fails because the TRO was issued with notice and, thus, the time limits found in Civ.R. 65(A) do not apply. His final argument within this assignment of error fails because he is estopped from re-litigating this court's determination that the TRO was a non-final, non-appealable order. For these reasons, Squire's first assignment of error is meritless.
 {¶ 60} In his second assignment of error, Squire contends:
 {¶ 61} "The trial court convicting him of criminal contempt base in part upon [sic] erred to the substantial prejudice of Appellant by a finding of fact in the entry dated May 22, 2001 that Mr. Squire' personally agreed to honor. . . .' the T.R.O. at the conclusion of the September 21, 2000 hearing."
 {¶ 62} Squire argues the trial court did not properly find him in contempt of court since its decision was based on incorrect findings of fact. Namely, he argues the trial court incorrectly found he `personally agreed to honor' the TRO at the September 21, 2000 hearing because he never agreed to do so.
 {¶ 63} Squire has not provided this court with a transcript of the proceedings of his May 22, 2001 contempt hearing. Accordingly, it is impossible to tell what evidence the trial court heard in order to make that factual finding. "If the appellant intends to urge on appeal that a finding or conclusion is unsupported by the evidence or is contrary to the weight of the evidence, the appellant shall include in the record a transcript of all evidence relevant to the findings or conclusion." App.R. 9(B).
 {¶ 64} This Court has previously explained the consequences of failing to provide a transcript of the proceedings when assigning error to evidentiary rulings. DeCato v. Goughnour (2000), 136 Ohio App.3d 795,799, 737 N.E.2d 1042. The duty to provide a transcript for appellate review when challenging an evidentiary ruling is on the party challenging the ruling. Knapp v. Edwards Laboratories (1980), 61 Ohio St.2d 197,199, 15 O.O.3d 218, 400 N.E.2d 384. When portions of the transcript necessary for resolution of the assigned errors are omitted from the record, reviewing courts have nothing to pass upon and, thus, we have no choice but to presume the validity of the trial court's proceedings as to those assigned errors, and affirm its decision. Id.
 {¶ 65} Because he is arguing the trial court's finding of fact was not supported by the evidence, Squire needed to provide a transcript of the hearing to this court for the purposes of appellate review. He did not do so, thereby denying this court the opportunity to review the accuracy of the trial court's factual findings. We are forced to presume the validity of the trial court proceedings and find this assignment of error meritless.
 {¶ 66} In his final assignment of error, Squire asserts:
 {¶ 67} "The trial court erred to the substantial prejudice of Appellant by finding that he `for a second time, defied the authority' of the court where the first finding of contempt was issued erroneously, in violation of state procedural rules, as well as federal law and regulations, and in violation of Appellant's state and federal constitutional rights."
 {¶ 68} Squire challenges the trial court's ability to rely upon its prior finding of contempt because that finding "was issued erroneously, in violation of state procedural rules, as well as federal law and regulations, and in violation of Appellant's state and federal constitutional rights." This assignment of error is, of course, related to the previous assignment of error as it challenges the factual basis underlying the trial court's finding of criminal contempt.
 {¶ 69} In Citicasters III, this court addressed whether the trial court erred the first time it found him in contempt of court. It affirmed the trial court's decision, finding all five of Squire's assignments of error challenging the contempt finding to be meritless. Because this court has already found the trial court did not err when it found Squire in contempt the first time, he may not collaterally attack that finding now as this issue is res judicata. Squire's third assignment of error is meritless.
 {¶ 70} In conclusion, a trial court is entitled to find a party in criminal contempt of court if that party violates a court order regardless of the validity of the underlying order. The TRO in this case had not expired as a matter of law as the adverse parties had notice of the TRO in accordance with Civ.R. 65(A) before that TRO was issued by the trial court. Finally, Squire had previously been found in contempt of court in this case and, although challenging the trial court's evidentiary rulings, has failed to provide this court with a transcript of the May 22, 2001 hearing. For these reasons, the trial court did not abuse its discretion when it found Squire in criminal contempt of court and each of Squire's assignments of error are meritless. Accordingly, the trial court's decision is affirmed.
Vukovich, P.J., concurs.
Donofrio, J., concurs.